**Eugene HORBACH, Plaintiff,**

v.

**Alvis KACZMAREK and One Three Six, Inc., f/k/a Shred Pax Corporation, an Illinois Corporation, Defendants.**

No. 95 C 5180.

United States District Court,
N.D. Illinois,
Eastern Division.

Dec. 5, 1997.

William J. Harte, William J. Harte, Ltd., Joseph E. Tighe, Joseph E. Tighe, P.C., Chicago, IL, William K. McInerney, Jr., McInerney & Baker, Seattle, WA, for Plaintiff.

Michael Dockterman, Wildman, Harrold, Allen & Dixon, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

BUCKLO, District Judge.

Eugene Horbach filed a multi-count complaint against Shred Pax Corporation ("Shred Pax") and its president, Alvis Kaczmarek. Both sides now move for summary judgment. For the reasons stated below, both motions for summary judgment are denied.

1. Mr. Horbach filed his initial complaint on September 11, 1995 and his first amended complaint on November 21 1995. I dismissed the first amended complaint in part on February 9, 1996. *Horbach v. Kaczmarek*, 915 F.Supp. 18 (N.D.Ill. 1996). Mr. Horbach filed his second amended complaint on March 8, 1996. I dismissed that complaint in part on July 22, 1996. *Horbach v. Kaczmarek*, 934 F.Supp. 981 (N.D.Ill.1996). Mr.

### Background

The parties have a long history before me.[1] After numerous motions by the parties, Count IX of Mr. Horbach's complaint remains. This count pertains to Mr. Horbach's attempted purchase of stock in Mr. Kaczmarek's company, Shred Pax. Mr. Horbach claims that he and Mr. Kaczmarek executed a Stock Purchase Agreement ("the Agreement") in November 1990. The Agreement acknowledges that Mr. Horbach paid $580,-000.00 as part of the purchase price of Shred Pax.

It is undisputed that the deal never closed. Mr. Horbach alleges that, despite his demand that the money be returned, Mr. Kaczmarek is holding onto $580,000.00. Mr. Horbach claims that Mr. Kaczmarek breached the Stock Purchase Agreement by refusing to finalize certain ancillary agreements and thus prevented the consummation of the transaction. Mr. Horbach seeks rescission of the Agreement and return of the $580,000. Mr. Kaczmarek argues that Mr. Horbach's suit is barred by paragraph 11 of the Agreement.

### Rescission

To state a cause of action for rescission under Illinois law, Mr. Horbach must establish (1) substantial nonperformance or breach of the Agreement by Mr. Kaczmarek, and (2) that the parties can be placed in the *status quo ante*. *Wilkonson v. Yovetich*, 249 Ill.App.3d 439, 618 N.E.2d 1120, 1125, 188 Ill.Dec. 550, 555 (1st Dist.1993); *accord Eager v. Berke*, 11 Ill.2d 50, 54, 142 N.E.2d 36, 38 (1957). "The determination of what constitutes substantial nonperformance justifying rescission is for the trier of fact." *Builder's Concrete Co. of Morton v. Fred Faubel & Sons, Inc.*, 58 Ill.App.3d 100, 373 N.E.2d 863, 867, 15 Ill.Dec. 517, 521 (3d Dist.1978).

Horbach amended his second amended complaint on November 22, 1996 by adding Counts IX and X. I granted summary judgment to Mr. Kaczmarek on counts VI and VII on March 5, 1997. *Horbach v. Kaczmarek*, No. 95 c 5180, 1997 WL 102540 (N.D.Ill. Mar.5, 1997). Mr. Horbach voluntarily dismissed Count X on May 5, 1997.

Mr. Horbach contends that Mr. Kaczmarek did not perform under the Agreement. Performance under the Agreement required the execution of a number of ancillary agreements that were to be negotiated between the time the Agreement was signed, on November 14, 1990, and the closing date, December 12, 1990. These are the condition precedents to closing that Mr. Horbach contends Mr. Kaczmarek did not "substantially perform" by unilaterally breaking off negotiations on the eve of closing.

Mr. Kaczmarek contends he did his best to negotiate the ancillary agreements and did substantially perform under the Agreement. Mr. Kaczmarek argues that Mr. Horbach was out of the United States from November 18, 1990, to December 3, 1990, and was thus unable to negotiate the ancillary agreements. Further, when Mr. Horbach returned to the country, Mr. Kaczmarek claims that all of the important documents necessary to complete negotiations were in Mr. Horbach's possession. (Pl.'s Exs. G & H). In addition, on December 3, 1990, Jeffrey Gray, Mr. Kaczmarek's counsel, notified Thaddas Alston, Mr. Horbach's counsel, that he wanted to discuss Mr. Kaczmarek's comments on the draft agreements as early as possible. (Pl.'s Ex. H). Mr. Gray also indicates that he phoned Mr. Alston on December 6th and December 7th to receive comments on the draft documents, but received no response. (Pl.'s Ex. M). According to a letter written

by Mr. Gray on December 17th, Mr. Alston did not get in touch with Mr. Gray until December 10th, two days before closing, and even then Mr. Alston had not completed discussions concerning the drafts with Mr. Horbach. *Id.* On December 11th, apparently frustrated by Mr. Horbach's lack of negotiating, Mr. Kaczmarek informed Mr. Horbach that he would no longer negotiate the terms of the ancillary agreements. (Pl.'s Ex. K). The Agreement never closed.[2]

Mr. Kaczmarek has presented evidence that he was ready and willing to negotiate the ancillary agreements and attempted to do so, in good faith, up until the day before closing. On this record, it is premature to declare that Mr. Kaczmarek did not substantially perform under the Agreement.

*Interpretation of Paragraph 11*

■ Mr. Kaczmarek argues that Mr. Horbach's claim is barred by Paragraph 11 of the Agreement.[3] Mr. Kaczmarek relies on the language in Paragraph 11 which states that "[Mr. Horbach] hereby agrees to indemnify, defend and hold [Mr. Kaczmarek]...harmless from and against any and all loss...as a result of any claim by...TyrRee Corporation ('TyrRee') or any of their agents, representatives, affiliates, successors or assigns, arising out of or in connection with any of the following:...(e) the negotiation and execution of this Agreement and the sale of any shares of the common stock of [Shred Pax] to [Mr.

---

2. A memorandum written by Mr. Horbach's counsel on December 31, 1990, which indicates Mr. Horbach may have decided prior to the closing date that he did not wish to consummate the Agreement with Mr. Kaczmarek, does lend credence to Mr. Kaczmarek's argument that Mr. Horbach purposefully failed to negotiate in an attempt to sabotage the deal.

3. The paragraph reads, in pertinent part, as follows:

11. *Purchaser's Indemnity.* Purchaser hereby agrees to indemnify, defend and hold Seller, the Company and its officers, shareholders, directors, employees, attorneys, agents or any of their affiliates, successors or assigns (collectively, the "Indemnified Parties") harmless from and against any and all loss, damage, liability and expense (including reasonable attorneys' fees and other litigation expenses) which any of the Indemnified Parties may suffer, sustain or incur as a result of any claim by Gellman Research Associates ("Gellman,

Inc."), Aaron J. Gellman ("Gellman"), W. Gerald Newmin, Will Kephart, Rosenthal & Schanfield, TyrRee Corporation ("TyrRee") or any of their agents, representatives, affiliates, successors or assigns, arising out of or in connection with any of the following: (a) the letter agreement dated July 11, 1989, among Gellman, Gellman, Inc. and Seller; (b) the letter agreement dated September 26, 1989, among TyrRee, the Company and Seller; (c) the purchase order dated September 26, 1989, between TyrRee and the Company; (d) the employment agreement dated September 22, 1989, between TyrRee and Seller; (e) the negotiation and execution of this Agreement and the sale of any shares of the common stock of the Company to Purchaser, the consummation of such sale, if at all, or any action in connection therewith, including, without limitation, any investigation of the Company by Purchaser or his agents or employees or (f) any allegations involving any of the items listed in (a)—(e) above :... 
(Stock Purchase Agreement at 10–11).

Horbach], the consummation of such sale, if at all, or any action in connection therewith...." (Stock Purchase Agreement at 10–11). I have previously found that Mr. Horbach is a successor of rights of TyrRee. *Horbach,* 915 F.Supp. at 21. Mr. Horbach, however, brings his claim in his individual capacity. The issue is whether Paragraph 11 bars all suits by TyrRee's successors, or whether claims brought in an individual capacity are permissible under Paragraph 11.

 Under Illinois law, "[w]here the sole dispute between the parties concerns the meaning of a contract provision, the threshold issue is whether the contract is ambiguous." *Ford v. Dovenmuehle Mortgage, Inc.,* 273 Ill.App.3d 240, 651 N.E.2d 751, 754, 209 Ill.Dec. 573, 576 (1st Dist.1995). This is a matter of law for the court. *Pepper Constr. Co. v. Transcontinental Ins. Co.,* 285 Ill. App.3d 573, 673 N.E.2d 1128, 1130, 220 Ill. Dec. 707, 709 (1st Dist.1996). In determining whether a contract provision is ambiguous, "the court must construe the contract as a whole, viewing each part in light of the others." *Ford,* 651 N.E.2d at 754, 209 Ill.Dec. at 576. "An ambiguity is said to exist in a contract when the contract contains language that is susceptible to more than one reasonable interpretation." *Id.*

 The language of a contract, however, "is not ambiguous simply because the parties disagree upon its meaning...nor is it ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends." *Foxfield Realty, Inc. v. Kubala,* 287 Ill.App.3d 519, 678 N.E.2d 1060, 1063, 223 Ill.Dec. 52, 55 (2d Dist.1997) (citations omitted). "[T]o the extent that a contract is susceptible of two interpretations, one of which makes it fair, customary, and such as prudent persons would naturally execute, while the other makes it inequitable, unusual, or such as reasonable persons would not be likely to enter into, the interpretation which makes a rational and probable agreement must be preferred." *Id.* "Courts will construe a contract reasonably to avoid absurd results." *Id.*

Mr. Kaczmarek argues the language in Paragraph 11 is unambiguous and that Mr.

Horbach had years to institute a suit before he became a successor to TyrRee's rights in 1995. Thus, according to Mr. Kaczmarek, Paragraph 11 does not function as a pre-breach release by Mr. Horbach of his right to sue. Mr. Kaczmarek's argument relies on happenstance. Under Mr. Kaczmarek's interpretation of Paragraph 11, if two days after Mr. Horbach signed the Agreement he became TyrRee's successor, the window of opportunity for a lawsuit would only have been two days. A contract that permits such a result would be an unusual one for Mr. Horbach to sign. Further, under Illinois law, corporate property that has not been disposed of within five years of dissolution automatically passes to shareholders. *Horbach,* 915 F.Supp. at 21. Thus, Mr. Horbach, as a shareholder of TyrRee, became TyrRee's successor five years after the company dissolved whether he wanted to or not. Again, under Mr. Kaczmarek's interpretation of Paragraph 11, even if Mr. Horbach had become an unwilling successor to TyrRee's rights, his individual claims would be barred simply based on his status as a successor.

Additionally, the Agreement contemplates the possibility of a suit between Mr. Horbach and Mr. Kaczmarek. Paragraph 14 permits the recovery of attorney's fees "[i]f a lawsuit arises between the parties...relative to [the] Agreement." (Stock Purchase Agreement at 12). Again, it would be unusual to include a paragraph on attorney's fees that could be rendered entirely moot by an assignment of rights within days of signing the Agreement.

 Paragraph 11 is susceptible to more than one reasonable interpretation and thus, is ambiguous. "If contract terms are ambiguous or capable of more than one interpretation, parol evidence is admissible to determine the intent of the parties. The interpretation of an ambiguous contract is a question of fact." *Pepper Constr. Co.,* 673 N.E.2d at 1130, 220 Ill.Dec. at 709.

Mr. Kaczmarek argues the extrinsic evidence leaves no doubt as to the meaning of Paragraph 11. To this end, Mr. Kaczmarek cites testimony by both attorneys who drafted the provision and Mr. Horbach, and a letter from one of Mr. Horbach's lawyers that was inadvertently disclosed during discovery. This evidence does not carry Mr. Kaczmarek's burden.

Mr. Kaczmarek notes that Thaddas Alston, the lawyer for Mr. Horbach responsible for helping to draft Paragraph 11, testified that, under the language of Paragraph 11, if Mr. Horbach himself was TyrRee's successor he would still have to indemnify or hold Mr. Kaczmarek harmless. (Alston Dep. at 72–73). Mr. Alston's testimony, however, is unclear as to whether he was considering a suit by Mr. Horbach in his capacity as a TyrRee successor or in an individual capacity.[4]

Mr. Kaczmarek also cites the testimony of Jeffrey Gray, Mr. Kaczmarek's counsel responsible for drafting Paragraph 11. Mr. Gray testified the language of Paragraph 11 would foreclose Mr. Horbach from making a claim under the agreement "[t]o the extent [Mr. Horbach is] a successor to TyrRee." (Gray Dep. at 71). Again, it is unclear from Mr. Gray's testimony whether he is considering the possibility of a suit by Mr. Horbach in Mr. Horbach's individual capacity as a party to the Agreement. Further, when asked directly whether Paragraph 11 barred a breach of contract claim by Mr. Horbach in his individual capacity, Mr. Gray stated he had no recollection. (Gray Dep. at 72). Additionally, Mr. Horbach's testimony does not indicate he believes Paragraph 11 bars his suit in his individual capacity.

Mr. Kaczmarek notes a letter written on March 6, 1996, by Robert Baker, a lawyer for Mr. Horbach, which indicates the Agreement requires Mr. Horbach to indemnify or hold Mr. Kaczmarek harmless. (Def.'s Ex. 43). The parties dispute whether the letter, which was inadvertently turned over during discovery, is still protected by the attorney-client privilege and if not, whether it is a party-admission. I agree that the inadvertent disclosure does not waive the attorney-client privilege.

*Conclusion*

Paragraph 11 bars suits by TyrRee's successors in their capacity as successors. Mr. Kaczmarek argues that Paragraph 11 is so broad it also captures Mr. Horbach, who sues in his individual capacity as a party to the Agreement. The language in this regard is ambiguous and open to more than one reasonable interpretation. Mr. Kaczmarek's presentation of extrinsic evidence does not settle the issue. Most of the testimony cited is ambiguous in regards to a suit by Mr. Horbach in his individual capacity. Accordingly, there is a genuine issue of material fact regarding the scope of Paragraph 11.[5] For these reasons, the motions for summary judgment are denied.

---

4. Additionally, Mr. Alston's testimony indicates the purpose of Paragraph 11 was to protect Mr. Kaczmarek against a suit by TyrRee. (Alston Dep. at 68–69). Apparently, there was some doubt as to whether Mr. Kaczmarek might be breaching an agreement with TyrRee by selling his shares in Shred Pax to Mr. Horbach. Through Paragraph 11, Mr. Horbach agreed to indemnify and hold Mr. Kaczmarek harmless should TyrRee choose to sue.

5. Mr. Kaczmarek argues that a claim by Mr. Horbach in his individual capacity could have been brought under Paragraph 7 of the Agreement and that the time period for making such a claim was limited to five years from the closing date. (Stock Purchase Agreement at 8–9). Paragraph 7 requires Mr. Kaczmarek to indemnify or hold Mr. Horbach harmless for Mr. Kaczmarek's breaches. Paragraph 7 and specifically the time limitation apply to indemnification. Mr. Horbach is not seeking indemnification in this suit and Mr. Kaczmarek has not explained how Paragraph 7 applies to this case.