# United States Court of Appeals
## For the First Circuit

No. 03-2622

FIT TECH, INC.; PLANET FITNESS CENTER OF MAINE, INC.;
PLANET FITNESS CENTER, INC.; PLANET FITNESS CENTER OF DARTMOUTH,
INC.; PLANET FITNESS CENTER OF SALEM, INC.; PLANET FITNESS CENTER
OF BRIGHTON, INC.; STRATFORD FITNESS CENTER, INC.;
DAVID B. LAIRD; SCOTT G. BAKER,

Plaintiffs, Appellees,

v.

BALLY TOTAL FITNESS HOLDING CORPORATION;
HOLIDAY UNIVERSAL, INC.,

Defendants, Appellants.

_____

JOHN H. WILDMAN,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Morris E. Lasker,* U.S. District Judge]

Before

Boudin, Chief Judge,

Torruella and Howard, Circuit Judges.

Juliet A. Davison with whom Howard M. Cooper and Todd & Weld
LLP were on brief for appellants.

_____

*Of the Southern District of New York, sitting by designation.

Deborah L. Thaxter, P.C. with whom Jonathan Sablone, Stephen M. LaRose and Nixon Peabody LLP were on brief for appellees.

_____

July 1, 2004

_____

**BOUDIN**, **Chief Judge**.  This appeal, presenting issues of contract law and appellate jurisdiction, arises out of the sale of a business.  The principal plaintiffs in the district court, David Laird and Scott Baker, previously owned and operated eight health and fitness centers in New England doing business under several names (e.g., "Planet Fitness"; "Fit Tech").  On April 19, 2002, Laird and Baker executed an "Asset Purchase Agreement" effective as of March 14, 2002, by which defendant Bally--a major owner of such fitness facilities--acquired plaintiffs' centers.[1]

The purchase agreement fixed the purchase price at $14.7 million payable at closing but provided that the total amount could be increased by a maximum of $12 million depending on earnings of the eight centers in the two years following the closing.  The formula for computing the extra payment depended primarily on earnings of the centers before corporate overhead, interest, taxes, depreciation and amortization; this figure is defined in the purchase agreement and called "EBITDA".  The purchase agreement sets out both procedures for calculating the amount and a time table.

Specifically, Bally was required to provide Laird and Baker quarterly reports setting forth Bally's calculation of the EBITDA.  An initial (75 percent) payment by Bally, based on the

---

[1]The principal defendants are Bally Total Fitness Holding Corporation and its subsidiaries, Holiday Universal, Inc. We refer to them collectively as "Bally."

"advance earn-out schedule," was to be determined within 90 days after the first anniversary of the closing date (i.e., by mid-July, 2003). The final calculation of the full supplemental amount, designated the "earn-out schedule," was due on the second anniversary of the closing. Section 3.5 of the purchase agreement then set out a process for dealing with disputes as to the schedules:

> (e) Protest Notice. Within sixty (60) days after delivery to the Sellers of the Advance Earn-Out Schedule or the Earn-Out Schedule, as applicable, the Sellers may deliver written notice (each, a "Protest Notice") to the Buyer of any objections, and the basis therefor, which the Sellers may have to the Advance Earn-Out Schedule or the Earn-Out Schedule, as applicable. Any such Protest Notice shall specify the basis for the objection, as well as the amount in dispute. The failure of the Sellers to deliver a protest notice within the prescribed time period will constitute the Sellers' acceptance of the Advance Earn-Out Schedule and the Earn-Out Schedule set forth therein, as applicable.

> (f) Resolution of the Sellers' Protest. If the Buyer and the Sellers are unable to resolve any disagreement with respect to the Advance Earn-Out Schedule or the Earn-Out Schedule within twenty (20) days following the Buyer's receipt of any Protest Notice, then the items in dispute will be referred to the Accountants for final determination within forty-five (45) days, which determination shall be final and binding on all of the parties hereto. The Accountants shall be engaged by the Sellers and the Buyer regarding the Advance Earn-Out Schedule or the Earn-Out Schedule, as applicable, based upon the written submissions of the Sellers and the Buyer, and the Accountants may, but shall not be required to, audit the Advance Earn-Out

-4-

> Schedule or the Earn-Out Schedule or any portion thereof. The Advance Earn-Out Schedule and the Earn-Out Schedule as ultimately prepared and finalized in accordance with this Section 3.5(f) shall thereafter be deemed to be and constitute the "Advance Earn-Out Schedule" and the "Earn-Out Schedule" respectively, for all purposes.

Elsewhere in the agreement, PriceWaterhouseCoopers ("Price Waterhouse") was designated as the accountants. A choice of law provision specified that the purchase agreement was to be governed by Illinois law.

The purchase agreement also provided that Laird and Baker would each sign an "Employment Agreement," making them area directors to manage and operate Bally's New England fitness centers. The employment agreement, unlike the purchase agreement, contained a standard arbitration clause providing that "[a]ny controversy or claim arising out of or relating to this employment agreement, or the breach thereof, shall be settled by arbitration" pursuant to the rules of the American Arbitration Association or a similar organization selected by Bally.

Laird and Baker began to serve pursuant to the employment agreements, but disagreements soon developed between them and Bally. In February 2003, Laird and Baker brought this diversity action against Bally in the federal district court in Massachusetts, charging Bally primarily with breach of contract and of an implied covenant of good faith and fair dealing. Claims were also made under the Massachusetts statute governing unfair and

-5-

deceptive trade practices, Mass. Gen. Laws ch. 93A, and a counterpart Illinois statute, 815 Ill. Comp. Stat. 505/2.

The complaint included extensive factual allegations of improper conduct by Bally. The district court essentially grouped these alleged wrongful acts in two categories. The first, comprising what we will call "accounting violations," alleged that Bally in its initial EBITDA calculations had improperly calculated earnings contrary to applicable accounting principles so as to reduce the extra purchase price that would be due. For example, Bally was alleged to have spread revenues from new memberships over the projected 22-month expected life while accruing the entire commission expense of the agent in the month that the membership was sold.

The second category consisted of numerous alleged actions taken by Bally that Laird and Baker said were wrongfully designed to reduce the extra earnings that would boost the purchase price. For instance, the complaint charged that Bally had used its computer system to direct phone inquiries away from the former Laird-Baker centers and toward Bally's pre-existing New England facilities and that Bally had provided the centers products unfit for sale. These and acts like them we will call "operating violations."

On March 21, 2003, Bally moved to dismiss the complaint, relying inter alia on the purchase agreement's requirement that

-6-

claims be submitted to "binding alternative dispute resolution" by the accountant under the purchase agreement. Bally did not mention the employment agreement's arbitration clause. On August 21, 2003, the district court concluded that certain of the factual allegations raised matters within the purview of the accountants under section 3.5(f) but that the majority--concerning Bally's allegedly improper operation of the businesses--did not and that those latter claims were properly reserved for disposition by the district court.

Bally then filed a motion to reconsider or clarify, asking the court to identify more clearly which claims were to be submitted to the accountant and also arguing that new events warranted reconsideration of the district court's decision to retain any of the claims for its own consideration. The new events concerned a traditional arbitration proceeding that Bally had begun against Laird in Chicago on June 30, 2003, under the arbitration clause in Laird's employment agreement.

In the Chicago proceeding, Bally sought a ruling that it was entitled to terminate Laird's employment for cause; later it asked for a declaration that both Laird and Baker were subject to restrictive non-compete covenants in their respective employment agreements. Laird and Baker then counterclaimed in the arbitration to seek monetary compensation for Bally's own alleged breaches of

the employment agreement, including four alleged episodes that had <u>also</u> been listed in Laird and Baker's federal complaint.

Bally argued that these overlapping claims should be dismissed because Laird and Baker "have elected to submit these claims to arbitration" in Chicago. More broadly, Bally contended that all of the issues retained by the district court for its own resolution were properly subject to arbitration under the employment agreement. By order entered on November 6, 2003, the district court clarified its apportionment of issues as between the court and the accountant, but it declined to refer any of the claims (overlapping or not) to the Chicago arbitration.

Bally has now filed an interlocutory appeal. It argues that the district court should not have retained any of the plaintiffs' claims; Bally says that all must be submitted to Price Waterhouse or, in the alternative, subject to the Chicago arbitration. At the very least (says Bally), the district court should not proceed to address the overlapping claims that are being presented both in the federal complaint and in Laird's and Baker's answer and counterclaim in the Chicago arbitration.

<u>Jurisdiction</u>. At the outset Laird and Baker say that we lack jurisdiction over Bally's appeal. The challenge to our jurisdiction arises because the district court's refusal either to dismiss the case or to leave all of the issues to Price Waterhouse or the Chicago arbitration is not a "final order" disposing of all

-8-

claims against all parties.  Thus, it is not appealable as a final judgment under 28 U.S.C. § 1291 (2000), and our jurisdiction must be based on one of the several statutory or case law exceptions to the final judgment requirement.

Section 16 of the Federal Arbitration Act, 9 U.S.C. § 16(a)(1)(B) (2000), explicitly permits an immediate appeal from a district court order "denying a petition under section 4 of this title to order arbitration to proceed."  See also Colón v. R.K. Grace & Co., 358 F.3d 1, 4 (1st Cir. 2003).  We think that the district court's orders are appealable under this section insofar as the district court refused to send all of the issues to the Chicago arbitration proceedings and--this is the trickier jurisdictional issue--as to the court's refusal to send them all to Price Waterhouse.

We start with Bally's request to refer the issues to the Chicago arbitration.  This request was made only in the motion for reconsideration following the district court's original August 21, 2003, order but the delay is not a bar:  the district court did not decline to address the request as forfeited by failure to make it earlier but instead decided on the merits that a reference to the Chicago arbitrator was not required.  Bally's explicit request for a reference to the Chicago arbitrator was effectively a request for an order to arbitrate under section 4, 9 U.S.C. § 4 (2000), which

is immediately appealable under section 16, 9 U.S.C. § 4, 16(a)(1)(B).

For two separate reasons, the refusal to send all the claims to Price Waterhouse is more difficult to equate with a refusal to order arbitration. One reason is that, as plaintiffs point out, Bally's request was not for a stay pending submission to Price Waterhouse or an order to arbitrate but for dismissal of the case because of the Price Waterhouse remedy. So far as pertinent, section 16 allows an interlocutory appeal only from an order denying a petition to compel arbitration; or from the denial of a stay pending such an arbitration. 9 U.S.C. §§ 3, 4, 16 (2000).

The courts are divided as to whether a request to dismiss a case based on an arbitration clause should be treated as a request for an order compelling arbitration.[2] Circumstances vary and one rule may not suit all cases. But here Bally clearly argued to the district court that under the purchase agreement the accountant had sole authority to resolve <u>all</u> issues. If that was right and Bally wanted the accountant to decide the issues, then

---

[2]Several courts have treated requests to dismiss on this ground as equivalent to a petition for an order compelling arbitration. <u>E.g.</u>, <u>Thomassen & Drijver-Verblifa N.V.</u> v. <u>Sardee Indus., Inc.</u>, NO. 88 C 4271, 1988 WL 102258, at *1 (N.D. Ill. Sept. 28, 1988); <u>Interstate Sec. Corp.</u> v. <u>Siegel</u>, 676 F. Supp. 54, 55 (S.D.N.Y. 1988). The District of Columbia Circuit held otherwise but suggested that the aggravated facts made a difference. <u>Bombardier Corp.</u> v. <u>National R.R. Passenger Corp.</u>, 333 F.3d 250, 252-54 (D.C. Cir. 2003). <u>See also</u> <u>Harrison</u> v. <u>Nissan Motor Corp. in U.S.A.</u>, 111 F.3d 343, 347-49 (3d Cir. 1997)(noting the problem without deciding).

the proper remedy would have been to stay the court proceeding and order arbitration--assuming that the accounting remedy is arbitration.

If Bally had wanted a dismissal but no decision by the arbitrator, then we would refuse to entertain an appeal by Bally to provide a reference that Bally had not sought and did not want. But in this case Bally clearly is invoking the accountant dispute resolution remedy, even if a stay rather than dismissal ensues. Since no one has been prejudicially misled by Bally's request for an over-favorable remedy of dismissal, its request for dismissal in favor of the accountant remedy can be treated as encompassing the lesser alternative remedy of a stay and reference.

This brings us to Bally's second hurdle, namely, to the question whether the accountant remedy is arbitration at all. If it is not arbitration, then remedies under the Federal Arbitration Act, including an interlocutory appeal, would be unavailable. The Act itself does not define "arbitration", see Harrison v. Nissan Motor Corp. in U.S.A., 111 F.3d 343, 350 (3d Cir. 1997). Whether the accountant remedy is "arbitration" under the federal statute is a characterization issue, which in our view is governed by federal law.

That a uniform federal definition is required is obvious to us. True, the substance of the purchase agreement--who promised to do what--is governed by state law (here, the parties agree, by

-11-

Illinois law), but whether what has been agreed to amounts to "arbitration" under the Federal Arbitration Act depends on what Congress meant by the term in the federal statute. Assuredly Congress intended a "national" definition for a national policy. Analogous cases are numerous.[3]

Curiously, there is a Ninth Circuit case to the contrary, Wasyl, Inc. v. First Boston Corp., 813 F.2d 1579, 1582 (9th Cir. 1987), followed by Hartford Lloyd's Ins. Co. v. Teachworth, 898 F.2d 1058, 1061-63 (5th Cir. 1990), but Wasyl assumed without real analysis that state law governed, and the Wasyl decision itself was rightly criticized by a more recent Ninth Circuit panel when forced to follow the earlier case. See Portland Gen. Elec. Co. v. United States Bank Trust Nat. Ass'n as Tr. for Trust No. 1, 218 F.3d 1085, 1091 (9th Cir. 2000) (Tashima, J., concurring); id. at 1091-92 (McKeown, J., specially concurring).

Whether the accounting remedy is "arbitration" under the federal statute is the more interesting question. The answer does not depend on the nomenclature used in the agreement, see AMF Inc. v. Brunswick Corp., 621 F. Supp. 456, 460 (E.D.N.Y. 1985); rather,

---

[3]See, e.g., Taylor v. United States, 495 U.S. 575, 590-92 (1990) (definition of "burglary" in 18 U.S.C. § 924(e) providing sentencing enhancement for possession of a firearm); NLRB v. Hearst Publ'ns, 322 U.S. 111, 120-123 (1944) (definition of "employee" under the National Labor Relations act); Jerome v. United States, 318 U.S. 101, 104-05 (1943)(definition of "felony" under the Bank Robbery Act); cf. Rankin v. Allstate Ins. Co., 336 F.3d 8, 12 n.3 (1st Cir. 2003)(waiver issues involving the Federal Arbitration Act to be determined by federal, not state, law).

the question is how closely the specified procedure resembles classic arbitration and whether treating the procedure as arbitration serves the intuited purposes of Congress. For example, other circuits (defensibly, in our view) have declined to treat an agreement for non-binding arbitration as "arbitration" within the meaning of the Act. See Dluhos v. Strasberg, 321 F.3d 365, 371 (3d Cir. 2003); Harrison, 111 F.3d at 349-52. But see Wolsey, Ltd. v. Foodmaker, Inc., 144 F.3d 1205, 1208-09 (9th Cir. 1998).

By contrast, in our case, the purchase agreement makes the Price Waterhouse remedy "final" (whether any more final than ordinary arbitration is doubtful but need not be decided now), and other common incidents of arbitration of a contractual dispute are present:  an independent adjudicator, substantive standards (the contractual terms of the pay-out), and an opportunity for each side to present its case. See General Motors Corp. v. Pamela Equities Corp., 146 F.3d 242, 246 (5th Cir. 1998); Harrison, 111 F.3d at 350; AMF Inc., 621 F. Supp. at 460. To us, this is arbitration in everything but name.[4]

In one respect, the accounting remedy departs from a common feature of many arbitrations. The district court found that

_____

[4]Selecting an expert to handle arbitration is by no means uncommon. E.g., Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 170 F.3d 1, 8 n.4 (1st Cir. 1999); Merit Ins. Co. v. Leatherby Ins. Co., 714 F.2d 673, 679 (7th Cir.), cert. denied 464 U.S. 1009 (1983).

the purchase agreement refers to Price Waterhouse for its resolution only the accounting issues and not the operational disputes that affect the pay-out. So, unlike many arbitrations, this limited reference cannot resolve the whole, or even the greater part, of the controversy between the parties. In consequence, a reference does not fully spare the court's resources, and it creates a two-track proceeding even as to claims of breach of contract.

Yet arbitrations sometimes do cover only a part of the over-all dispute between the parties. E.g., Coady v. Ashcraft & Gerel, 223 F.3d 1, 4 (1st Cir. 2000); McDonnell Douglas Fin. Corp. v. Pa. Power & Light Co., 858 F.2d 825, 831-33 (2d Cir. 1988). If this adds to the procedural complexity, it may still provide a swifter (and depending on the arbitrator a more expert) answer to the questions that are arbitrated. References to agencies under the somewhat analogous primary jurisdiction doctrine sometimes comprise only a single narrow issue referred to the agency before the federal law suit goes forward. See, e.g., U.S. Pub. Interest Research Group v. Atl. Salmon of Me., LLC, 339 F.3d 23, 34 (1st Cir. 2003); Mass. v. Blackstone Valley Elec. Co., 67 F.3d 981, 992 (1st Cir. 1995).[5]

---

[5]Our conclusion makes it unnecessary to consider Bally's alternative argument that the failure to order resort to the accountant is appealable under 28 U.S.C. § 1292(a)(1)(2000), giving appellate jurisdiction over "orders that grant or deny injunctions and orders that have the practical effect of granting or denying

Arbitrability of the issues. Having confirmed our jurisdiction over the appeal, we turn next to the question whether the district court correctly construed the purchase agreement when it referred to Price Waterhouse only the accounting issues and retained the remaining misconduct charges for itself. The district court's bifurcation might at first surprise a reader given to literalism; but it rests on a realistic parsing of the purchase agreement and is ultimately correct.

The pertinent language of the purchase agreement, quoted more fully above, says that "any disagreement with respect to the Advance Earn-Out Schedule or the Earn-Out Schedule" will, if unresolved after the protest notice, be referred to the accountants for a "final" determination. The operational misconduct could, just like ordinary accounting errors, alter the figures in the two schedules and reduce the pay-out. So, Bally seemingly argues, whether operational misconduct occurred is for the accountants to decide.

---

injunctions and have 'serious, perhaps irreparable, consequence.'" Gulfstream Aerospace Corp. v. Mayacamas Corp., 485 U.S. 271, 287-288 (1988)(quoting Carson v. Am. Brands, Inc., 450 U.S. 79, 84, (1981)). The case law on this subject is complicated. See generally Gulfstream Aerospace Corp., 485 U.S. at 279-88; Tejidos de Coamo, Inc. v. Int'l Ladies' Garment Workers' Union, 22 F.3d 8, 10-11 (1st Cir. 1994). Compare Kan. Gas & Elec. Co. v. Westinghouse Elec. Corp., 861 F.2d 420, 422 (4th Cir. 1988), and Nordin v. Nutri/System, Inc., 897 F.2d 339, 342 (8th Cir. 1990) (appealable under 28 U.S.C. § 1292(a)(1)), with DSMC Inc. v. Convera Corp., 349 F.3d 679, 682 (D.C. Cir. 2003), and Cent. States v. Cent. Cartage Co., 84 F.3d 988, 990-92 (7th Cir.), cert. denied, 519 U.S. 912 (1996) (not appealable).

Absent admissible extrinsic evidence bearing upon intent, a court in interpreting disputed contract language asks what reasonable persons in the position of the parties would ordinarily have intended by using the words in question in the circumstances. 2 Farnsworth on Contracts §§ 7.9, 7.10 (3d ed. 2004), a view followed in Illinois; Horbach v. Kaczmarek, 988 F. Supp. 1126, 1129 (N.D. Ill. 1997); Tatar v. Maxon Constr. Co., 294 N.E.2d 272 (Ill. 1973). By this test, referring the operational issues to the accountants makes no sense.

The phrase "any disagreement" refers to earning schedules whose components are defined in detail in the purchase agreement in accounting terms: specifically, the EBITDA formula for earnings of the eight centers before certain other costs (e.g., interest, taxes, depreciation) are taken into account. And, the unresolved disagreements are to be referred to "accountants." In context, it therefore makes most sense to read "any disagreements" as referring to disagreements about accounting issues arising in the calculations that underpin the schedules.

Conversely, it makes no sense to assume that accountants would be entrusted with evaluating disputes about the operation of the business in question. Yes, operational misconduct may well affect the level of earnings and therefore the schedules, but the misconduct itself would not be a breach of proper accounting standards. Nor would one expect accountants to have special

-16-

competence in deciding whether business misconduct unrelated to accounting conventions was a breach of contract or any implied duty of fair dealing.

Thus, the accounting treatment of new membership sales was correctly regarded by the district court as an issue properly reserved for Price Waterhouse; but whether Bally had manipulated the phone system to divert calls from the eight centers to other Bally centers involves not an accounting question but contract interpretation and judgments about reasonable business practices. Whether specific issues fall on one side or the other of the dividing line could be disputed; but on this appeal Bally has attacked only the district court's general bifurcation approach and not its classification of particular misconduct claims.

The district court's reading is supported by at least four different cases in which clauses directing certain disputes to accountants were read as implicitly limited to accounting issues.[6] In two of the cases, the precise phrasing of the clauses made this conclusion even easier to reach than it is in the present case, see Blutt v. Integrated Health Servs., Inc., No. 96 CIV. 3612 LLS., 1996 WL 389292, at *2 (S.D.N.Y. July 11, 1996); United Steelworkers

_____

[6]Blutt v. Integrated Health Servs., Inc., No. 96 CIV. 3612 LLS., 1996 WL 389292 (S.D.N.Y. July 11, 1996); Powderly v. MetraByte Corp., 866 F. Supp. 39 (D. Mass. 1994); United Steelworkers of Am. v. Nat'l Roll Co., No. 89-1491, 1990 WL 10043689 (W.D. Pa. May 3, 1990); Parker v. Twentieth Century-Fox Film Corp., 173 Cal. Rptr. 639 (Cal. Ct. App. 1981).

-17-

of Am. v. Nat'l Roll Co., No. 89-1491, 1990 WL 10043689, at *2 n.1 (W.D. Pa. May 3, 1990), but the other two decisions are not very far from our own. In all events, if the Red Sox' sports announcer says that the batter hit the ball out of the park, everyone knows that a baseball is implied.

Bally relies principally upon Mayfair Constr. Co. v. Waveland Assocs. Phase I Ltd. P'ship, 619 N.E.2d 144 (Ill. App. Ct. 1993). There the court read contract language as requiring the submission to an architect (essentially for non-binding arbitration) of disputes about schedule extensions and cost increases in the construction of a building. Id. at 146-53. The case gives Bally a bit of support but not too much.

The need for extensions of time for construction and resulting cost effects of delay are arguably matters within the normal competence of an architect. Further, the clause in Mayfair explicitly directed that the architect "will be the interpreter of the requirements of the Contract Documents and the initial judge of the performance thereunder by both the Owner and Contractor. . . . In his capacity as interpreter and judge, he will endeavor to secure faithful performance by both the Owner and Contractor." Id. at 147. Mayfair is thus quite distinguishable.

This brings us to Bally's alternative claim, in its petition for reconsideration to the district court, that the Chicago arbitration alters the situation and calls for deferral of

the court-retained claims in favor of the Chicago proceeding. Bally has two versions of this argument. In the "strong" version, Bally argues that the general arbitration clause in the employment agreement covers the claims made by Laird and Baker in the court case. The short answer is that it does not.

The arbitration clause says that "[a]ny controversy or claim arising out of or relating to this Employment Agreement, or the breach thereof, shall be settled by arbitration" as specified in the agreement. The "arising out of" language is plainly inapplicable; the complaint itself makes clear that all of the claims in the district court case arise out of supposed breaches of the purchase agreement, its implied covenant of fair dealing and associated statutory duties.

The "relating to" language is more vague, and therefore potentially broader, but if no proceedings had been begun in Chicago, no one would claim that district court case involved a claim "relating to" the employment agreement. It would be a far more normal use of words to say that such a claim was related to the purchase agreement whose alleged breach is the umbrella cause of action in the district court. That the same misconduct could also play a role in the Chicago arbitration is a different matter to which we return below.

Bally says that the distinction between the two agreements is artificial. It points out that the employment

-19-

agreements were referenced in, and required by, the purchase agreement; that the earn-out opportunities provided by the latter were related to the plaintiffs' continued employment; and that the integration clause in the purchase agreement refers to the purchase agreement and documents referred to in it as comprising the complete and exclusive agreement between the parties.

These inter-relationships are real but the juxtaposition of the two documents hurts Bally more than it helps it. The two agreements do comprise understandings related to the same business sale and, in interpreting the documents, one provides context for the other. But the two documents deal with different aspects of the sale (asset purchase and subsequent employment). No one can seriously argue that clauses can be plucked at random from one agreement and inserted into the other.

The general arbitration clause appears only in the employment agreements and refers to disputes arising under or related to that agreement. Further, not only is such a clause omitted from the purchase agreement (although it would have been child's play to insert it there) but the purchase agreement has instead a different, and narrower, dispute resolution process relying on the accountants; that process would be redundant-- indeed, inconsistent--if the same matter were covered by the general arbitration clause in the employment agreement.

The Rosenblum decision is more or less on point, Rosenblum v. Travelbyus.com Ltd., 299 F.3d 657 (7th Cir. 2002). There a business sale and employment agreement were paired and, when the seller sued under the sale agreement for failure to pay, the buyer invoked the arbitration clause of the employment agreement. Id. at 659-665. The Seventh Circuit rejected the attempt. In language no less applicable here, the court said:

> "Generally, one instrument may incorporate another instrument by reference." Turner Constr. Co. v. Midwest Curtainwalls, Inc., 543 N.E.2d 249, 251 (Ill. App. Ct. 1989). "The contract must show an intent to incorporate the other document and make it part of the contract itself." Id. "When determining under Illinois law whether something is incorporated into a contract, we limit our inquiry to the four corners of the contract." Atl. Mut. Ins. Co. v. Metron Eng'g & Constr. Co., 83 F.3d 897, 901 (7th Cir. 1996). . . . None of the [] provisions relied upon by the district court incorporates the Employment Agreement by reference. There is no doubt that the Acquisition Agreement refers to the Employment Agreement, but there is no "intention to incorporate the document and make it a part of the contract" on the face of the Acquisition Agreement itself. . . . A merger clause does not incorporate other contracts by reference, rather, a merger clause negates the impact of earlier negotiations and contract drafts, and states that the written contract is the complete expression of the parties' agreement.

Id. at 664-65.

A pair of Fifth Circuit cases invoked by Bally did transpose arbitration clauses among contemporaneously executed

-21-

related contracts, but the cases are distinguishable, especially because in our case each agreement has its own dispute resolution process. Personal Sec. & Safety Sys. Inc. v. Motorola Inc., 297 F.3d 388, 392-93 (5th Cir. 2002); Neal v. Hardee's Food Systems, Inc., 918 F.2d 34, 36-37 (5th Cir. 1990). Further, both the Seventh and Fifth Circuits said they were applying state law in construing the scope of their respective contracts, Rosenblum v. Travelbyus.com Ltd., 299 F.3d at 662 n.2; Neal, 918 F.2d at 37 & n.5, and as between Illinois and Texas law, the former is the governing law in our own case so far as the substance of the agreement is concerned.

Alternatively (this is the "weak" version of Bally's argument), Bally says that, even if its incorporation argument fails, Laird and Baker have affirmatively "elected" arbitration as to those misconduct issues that they have themselves raised in the Chicago proceeding by answer and counterclaim. These include some but not all of the issues retained by the district court. The district court said briefly in its order on reconsideration that the plaintiffs' answer and counterclaim in the Chicago arbitration proceeding was not a waiver of their right to proceed in the district court.

The terms "election" and "waiver" are used in various ways by the cases, in different contexts, and are often used for conclusion rather than analysis. In some recurring situations, the

labels are easy to apply--for example, one who has an option to arbitrate or sue and chooses to arbitrate ordinarily makes an election that cannot be rescinded after an unfavorable result. E.g., Kiernan v. Piper Jaffray Cos., 137 F.3d 588, 594 (8th Cir. 1998). The present case is less straightforward.

Laird and Baker did not initiate the arbitration: the Chicago proceeding was begun by Bally after the court case had started and was directed at a different agreement than was the court case. Still, plaintiffs have sought to make certain of the misconduct claims in the court case do double duty as defenses or counterclaims in the arbitration. This overlap, which is the source of several problems, is the linchpin of the Bally's election or waiver argument.

To the extent that Laird and Baker could without prejudice to their interests in the arbitration have withheld these misconduct allegations from the Chicago proceeding, their choice to assert them in the arbitration might be treated by a court as an election or waiver of the right to present them in court. But to the extent that failing to assert them meant that arguable defenses in the arbitration would be foregone, or possible damage claims for breach of the employment contract would be precluded in the arbitration, the answer and counterclaim were compelled by Bally's own choice to pursue arbitration.

To us, it seems likely that any defense to Bally's claims in arbitration would have to be presented there or be forfeit; whether plaintiffs were also effectively compelled to assert matching counterclaims is less clear. But given the breadth of the arbitration clause, the start of arbitration by Bally, and the opportunity for Laird and Baker to assert their damage claims in arbitration, it would have been a foolish lawyer who told them that they could safely withhold the misconduct charges from their answer and counterclaim.

This threat of prejudice would not necessarily preclude treating the defense and counterclaim as an election of arbitration over the court suit; we are dealing with judicial policy not self-executing labels. But it is less clear what judicial policy ought to be where, as here, a misconduct issue turns out to be common both to an arbitrable dispute (as to one agreement) and to a judicial dispute (as to another) that was never the subject of an arbitration agreement. The Federal Arbitration Act favors arbitration; but only as to what the parties have agreed to arbitrate. Restoration Pres. Masonry, Inc. v. Grove Europe Ltd., 325 F.3d 54, 60 (1st Cir. 2003).

Nor is it clear that economy would be served by deferring to arbitration as to the overlapping issues. For several reasons, arbitration is less likely to yield findings that resolve common issues under res judicata doctrine; arbitrators do not always make

explicit findings and whether findings by an arbitrator bind a court faced with the same issue and parties but a different claim is less than crystal clear. See generally 18B Wright, Miller, and Cooper, Federal Practice and Procedure § 4475.1 (2d ed. 2002).

Bally cites two cases to support its claim of waiver or election but both can readily be distinguished. In both cases the party seeking to litigate had initially elected arbitration and only sought to bring the case to court when the arbitration seemed to be going against them. Kiernan, 137 F.3d at 594; Nghiem v. NEC Elec., Inc., 25 F.3d 1437, 1440 (9th Cir.), cert. denied, 513 U.S. 1044 (1994). There, the policies supporting waiver or election apply with full force; in our case they do not.

To sum up, on these facts we think that the argument for waiver or election is weak and the district court was right to reject it. The court case was filed first, plaintiffs were more or less forced to answer and counterclaim in the arbitration, and the fact that only some of the issues overlap makes two proceedings inevitable. In these circumstances--and without prejudice to the authority of the trial judge to manage the case before him--we do not see why the arbitration should have an invincible and automatic priority in the decision of common issues.

Absent more help and reflection, we decline to lay down general rules for situations where a court case and an arbitration address distinct legal claims but common issues of fact or

characterization. The range of possible situations is great and the precedents bearing on the overlap problem scarce. More experience may generate useful rules, but for now an ad hoc judgment based on the circumstances of this peculiar case will have to do.

Affirmed.