In the

# United States Court of Appeals
## For the Seventh Circuit

No. 24-2136

GARAGE DOOR SYSTEMS, LLC, d/b/a OVERHEAD DOOR
COMPANY OF INDIANAPOLIS,

*Plaintiff-Appellee,*

*v.*

BLUE GIANT EQUIPMENT CORPORATION,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:23-cv-02223-JMS-KMB — **Jane Magnus-Stinson**, *Judge.*

ARGUED JANUARY 16, 2025 — DECIDED APRIL 11, 2025

Before SCUDDER, KIRSCH, and LEE, *Circuit Judges.*

KIRSCH, *Circuit Judge.* Overhead Door Company of Indianapolis contracted with Blue Giant Equipment Corporation, a Canadian company, for the purchase of multiple dock levelers. When issues with the levelers arose after installation, Overhead sued Blue Giant in federal court under diversity jurisdiction for breach of contract and warranty. Blue Giant moved to dismiss, pointing to a provision in the standard

terms listed on its website that requires parties to arbitrate disputes in Ontario, Canada. The district court denied the motion, concluding that the standard terms were not incorporated into the parties' contract. We disagree and reverse.

I

Overhead Door Company of Indianapolis is a U.S. company that services, repairs, and replaces residential and commercial garage doors. Blue Giant Equipment Corporation is a Canadian company that manufactures dock levelers, which bridge the gap between a trailer and a dock during the loading and unloading process. Over the course of a year, Overhead purchased several dock levelers from Blue Giant.

Overhead and Blue Giant's contracting process took place primarily over email and proceeded as follows: When Overhead expressed interest in purchasing levelers, Blue Giant responded with a price quote. Located at the bottom of the price quote was a brief instruction to refer to Blue Giant's website for "current terms and conditions," accompanied by a link to the website. Based on this quote, Overhead sent a Purchase Order that included the quantity of goods it wished to buy, the price per item, and the pricing for shipping and taxes. Blue Giant responded with an Order Acknowledgement form, which reiterated the information contained in the Purchase Order and included additional terms relating to shipping and payment. A text box in the center of the Order Acknowledgement contained the following language:

> This document confirms receipt of your purchase order. All Equipment orders must be confirmed by the customer within 24 hours. Send acceptance to orderentry@bluegiant.com. Only

> Orders that have been confirmed will be sched-
> uled for Manufacturing. All Parts orders, unless
> specified in the purchase order, will be shipped
> as soon as the part becomes available. Terms
> and Conditions can be found at www.bluegi-
> ant.com/about-us/terms.

The Terms and Conditions on Blue Giant's website contained an arbitration clause requiring that all contractual disputes be resolved through binding arbitration in Ontario, Canada. Overhead confirmed its receipt and acceptance of the Order Acknowledgement via email.

Blue Giant supplied the dock levelers to Overhead pursuant to their agreement. Soon after installation, however, Overhead began to complain that the levelers were not performing as promised. Blue Giant made several attempts to repair the levelers, but its efforts proved unsuccessful, and Overhead eventually purchased replacement levelers from another company. After attempts at mediation broke down, Overhead sued Blue Giant in district court under diversity jurisdiction, asserting various breach of contract and breach of warranty claims. Blue Giant moved to dismiss for improper venue, arguing that Overhead was bound to arbitrate the dispute in Canada per the standard terms referenced in the Order Acknowledgement. The district court denied the motion to dismiss, finding that the mere reference to standard terms contained on a website was insufficient to incorporate the terms into the parties' contract. This appeal followed.

## II

Congress enacted Chapter 1 of the Federal Arbitration Act, 9 U.S.C. §§ 1–16, in 1925 to "ensure that private arbitration

agreements are enforced according to their terms." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011) (cleaned up). When a party neglects or refuses to arbitrate despite a valid written agreement to do so, § 4 authorizes a district court to issue an order compelling arbitration. 9 U.S.C. § 4. Our circuit has generally interpreted the authority to compel arbitration under § 4 as geographically limited, meaning a district court cannot compel arbitration "outside the confines of its district." *Faulkenberg v. CB Tax Franchise Sys., LP*, 637 F.3d 801, 808 (7th Cir. 2011); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lauer*, 49 F.3d 323, 327 (7th Cir. 1995) ("[W]here the arbitration agreement contains a forum selection clause, only the district court *in that forum* can issue a § 4 order compelling arbitration."). Both Blue Giant and the district court believed the court had no authority to compel arbitration in Ontario, Canada, and thus thought the arbitration agreement could only be enforced via a motion to dismiss for improper venue under Federal Rule of Civil Procedure 12(b)(3). This conclusion was incorrect for two reasons.

First, dismissal under Rule 12(b)(3) is "no longer a permissible means of enforcing arbitration agreements" after the Supreme Court's ruling in *Atlantic Marine Construction Co. v. United States District Court for the Western District of Texas*, 571 U.S. 49 (2013). *Rodgers-Rouzier v. Am. Queen Steamboat Operating Co.*, 104 F.4th 978, 984 (7th Cir. 2024). In *Atlantic Marine*, the Supreme Court clarified that forum selection clauses cannot render venue improper. 571 U.S. at 57. Accordingly, a valid forum selection clause should be enforced through a motion to transfer under 28 U.S.C. § 1404(a) or, if the clause designates a state or foreign forum, through a motion to dismiss for forum non conveniens. *Id.* at 60. Ordinarily, a court considering transfer or forum non conveniens must weigh

both private and public interest factors to determine whether the plaintiff's choice of forum may be overcome. *Id.* at 62–63. But "[t]he calculus changes" in the presence of a valid forum selection clause, which should be "given controlling weight in all but the most exceptional cases." *Id.* at 63 (quotation omitted). We have subsequently applied *Atlantic Marine*'s reasoning to arbitration provisions selecting out-of-district arbitral forums. See, e.g., *Dr. Robert L. Meinders, D.C., Ltd. v. United Healthcare Servs., Inc.*, 7 F.4th 555, 560 (7th Cir. 2021); *Rock Hemp Corp. v. Dunn*, 51 F.4th 693, 701–02 (7th Cir. 2022). Thus, when a district court lacks authority to compel arbitration in the designated arbitral forum, parties may enforce the agreement through either a motion to dismiss for forum non conveniens or, when applicable, a motion to transfer venue to a district court that does have authority to compel arbitration. Cf. *Sharif v. Wellness Int'l Network, Ltd.*, 376 F.3d 720, 727 (7th Cir. 2004) (observing that filing neither a motion to dismiss nor a motion to transfer venue waives a party's right to arbitrate).

Second, and more fundamentally, it was unnecessary for Blue Giant to seek dismissal because the district court did have authority to compel arbitration in this case. The district court cited our decision in *Faulkenberg* for the proposition that a motion to compel arbitration is not the appropriate enforcement mechanism when parties have agreed to arbitrate outside the confines of the district. 637 F.3d at 808. But *Faulkenberg* referred only to motions to compel under § 4 of the FAA. Other statutory provisions apply to international arbitration disputes like the one at issue here. In 1970, Congress enacted Chapter 2 of the FAA, 9 U.S.C. §§ 201–208, which implements the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330

U.N.T.S. 3. *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 590 U.S. 432, 439 (2020). The Convention governs commercial arbitration agreements between citizens of contracting states, 9 U.S.C. § 202, including the United States and Canada. See New York Convention, *Contracting States*, https://www.newyorkconvention.org/contracting-states. Section 206 of the FAA empowers district courts to compel arbitration to enforce agreements under the Convention. And unlike § 4, a district court's authority to compel arbitration under § 206 is not geographically limited: § 206 grants district courts express authority to "direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States." Cf. *Jain v. de Méré*, 51 F.3d 686, 689–90 (7th Cir. 1995) (analyzing the relationship between § 4 and § 206).

We note the applicability of § 206 because it informs our jurisdictional analysis. Ordinarily, a district court's decision to deny a motion to dismiss is not a final appealable judgment. *Brickstructures, Inc. v. Coaster Dynamix, Inc.*, 952 F.3d 887, 890 (7th Cir. 2020). But in keeping with its broader purpose to promote enforcement of arbitration agreements, the FAA authorizes immediate interlocutory appeals of certain district court orders that have the effect of denying arbitration, including denials of applications to compel arbitration under § 206. 9 U.S.C. § 16(a)(1)(C). True, Blue Giant presented its arbitration argument in a motion to dismiss rather than a motion to compel arbitration. But because "it is the substance of a motion that counts, not its label," jurisdiction under § 16(a) may exist when a request for dismissal was "rooted in enforcement of [an] arbitration agreement." *Brickstructures*, 952 F.3d at 890.

Looking to the substance of the motion to dismiss, we are satisfied that Blue Giant's intent was to pursue arbitration. The motion expressly states that the dispute is governed by the FAA, and Blue Giant's sole argument for dismissal rests on the existence of a valid arbitration agreement and the FAA's requirement that such agreements be rigorously enforced. It is also evident from the motion itself that Blue Giant only sought dismissal because it (erroneously) believed it could not move to compel arbitration under our circuit's precedent. Under these circumstances, it is appropriate to construe Blue Giant's motion to dismiss as, in substance, a motion to compel arbitration under § 206. Accordingly, we have jurisdiction to hear this interlocutory appeal pursuant to 9 U.S.C. § 16(a)(1)(C). Cf. *Brickstructures*, 952 F.3d at 890; *Fit Tech, Inc. v. Bally Total Fitness Holding Corp.*, 374 F.3d 1, 6 (1st Cir. 2004) (finding jurisdiction under § 16(a) where movant's motion to dismiss argued that arbitrator had sole authority to resolve all issues); *Henry ex rel. BSC Ventures Holdings, Inc. Emp. Stock Ownership Plan v. Wilmington Tr. NA*, 72 F.4th 499, 505 (3d Cir. 2023) (finding jurisdiction under § 16(a) where a party explained that it brought a motion to dismiss only because the district court could not compel arbitration in the arbitral forum).

### III

Having resolved these threshold issues, we turn our attention to the merits. The parties agree that Blue Giant's Order Acknowledgement was a counteroffer which Overhead accepted, making the terms of the Order Acknowledgement the operative agreement. The heart of the parties' disagreement is whether Blue Giant's reference in the Order Acknowledgement to the Terms and Conditions located on its website was

sufficient to incorporate these terms (and the arbitration provision therein) into the contract.

A

Both parties agree that their contract is governed by the United Nations Convention on Contracts for the International Sale of Goods, Apr. 11, 1980, S. Treaty Doc. No. 98–9 (1983), 1489 U.N.T.S. 3 (CISG). The CISG applies to contracts for the sale of goods between businesses located in different treaty countries. Art. 1(1). "As a self-executing treaty between the United States and other signatories, including Canada, the Convention supersedes state law when it applies." *VLM Food Trading Int'l, Inc. v. Ill. Trading Co.*, 748 F.3d 780, 787 (7th Cir. 2014) (citation omitted) (cleaned up). In addition to the text of the CISG, both parties rely on interpretive guidance from the CISG Advisory Council; we too find the Advisory Council's guidance helpful to our analysis.

Under the CISG, we interpret the statements and conduct of Blue Giant according to its intent where Overhead "knew or could not have been unaware what that intent was." Art. 8(1). Otherwise, Blue Giant's statements are interpreted according to "the understanding that a reasonable person of the same kind as [Overhead] would have had in the same circumstances." Art. 8(2). In performing this analysis, "due consideration is to be given to all relevant circumstances of the case including the negotiations, any practices which the parties have established between themselves, usages and any subsequent conduct of the parties." Art. 8(3).

These general interpretive principles apply with equal force to the inclusion-by-reference of standard terms. Advisory Council of the CISG, Opinion No. 13, "Inclusion of

Standard Terms Under the CISG," 2 (Jan. 20, 2013). "Standard terms are included in the contract where the parties have expressly or impliedly agreed to their inclusion at the time of the formation of the contract and the other party had a reasonable opportunity to take notice of the terms." *Id.* Accordingly, it was Blue Giant's responsibility to ensure the reference to their standard terms was not "hidden away" and instead was "set out in a manner and at a place where a reasonable contractual party would have noticed [it]." *Id.* at 15. As the Advisory Council recognizes, it is now "commonplace" for commercial parties engaged in contract negotiations to refer to standard terms contained on a website. *Id.* at 13. In such cases, the other party will typically have reasonable opportunity to take notice of terms that are accessible over the internet at the time of contracting. *Id.* When parties negotiate via email, it will also generally suffice for notice purposes "if the standard terms … can be accessed by clicking on a hyperlink leading to the applicable terms." *Id.*

B

Overhead argues that the reference in the Order Acknowledgement to Terms and Conditions on Blue Giant's website did not convey Blue Giant's intent to incorporate these terms into the parties' contract. We disagree. To begin, we observe that Overhead could have immediately resolved any uncertainty as to the relevance of the Terms and Conditions by simply reading them. The very first sentence of the Terms and Conditions states: "These General terms and conditions of the Sale … as supplemented by any additional Sales terms … are collectively the entire agreement between the Buyer and Blue Giant regarding the sale of products." And there is "nothing in the CISG … that signals any retreat from the proposition

that parties who sign contracts will be bound by them regard-less of whether they have read them." See *MCC-Marble Ceramic Ctr., Inc. v. Ceramica Nuova d'Agostino, S.p.A.*, 144 F.3d 1384, 1387 n.9 (11th Cir. 1998).

Nevertheless, Overhead maintains that this case is not about its failure to read but about Blue Giant's failure to write—specifically, Blue Giant's failure to expressly state that the standard terms formed part of the contract. Though Overhead acknowledges that the CISG does not require specific magic words or incorporating phrases, it urges that a party must still clearly express its intent to incorporate standard terms through words. But under the CISG, parties can agree to the inclusion of standard terms either expressly or impliedly. Opinion No. 13 at 2. Express incorporating language is therefore unnecessary when standard terms are provided alongside the offer and are sufficiently conspicuous or notice-able to a reasonable person. *Id.* Indeed, the Advisory Council favorably cites a case from the Eastern District of California in which a party emailed an offer in the form of a sales quote with general conditions attached as a separate document. See *Golden Valley Grape Juice & Wine, LLC v. Centrisys Corp.*, No. CV F 09-1424, 2010 WL 347897 (E.D. Cal. Jan. 22, 2010). Though the sales quote itself contained no language incorporating the attached general conditions, the court concluded that they were provided contemporaneously and were thus clearly intended as part of the offer. *Id.* at *5. By contrast, the Advisory Council criticizes a French case in which a court found that the lack of an incorporation clause on the front side of an order form rendered the standard terms printed on the reverse side unincorporated. This decision was problematic, the Advisory Council explains, because the court neglected to consider "whether the writing on the back of the order form

was conspicuous … or whether a reasonable person in the position of the seller would have noticed such terms on the back of this document." See Opinion No. 13 at 11.

To be sure, Blue Giant's intent to incorporate the Terms and Conditions would have been clear beyond any doubt had the Order Acknowledgement stated that the agreement was subject to or incorporates by reference the terms contained on the website. But as the preceding cases illustrate, parties need not expressly state their intent to incorporate separate standard terms when this intent is otherwise obvious. And Blue Giant did enough here to make its intent clear. It provided the standard terms contemporaneously with its offer, and the reference to them was neither "hidden away" nor printed "in such a manner that it [was] easy to overlook." *Id.* at 15. The reference was printed legibly in a text box in the very center of the Order Acknowledgement form, a place "where a reasonable contractual party would have noticed [it]." *Id.* Under these circumstances, Overhead was not entitled to simply ignore the terms nor Blue Giant's conspicuous reference to them.

In reaching this conclusion, we are particularly mindful of the CISG's instruction to interpret Blue Giant's conduct and statements according to how a reasonable party "of the same kind" as Overhead would have understood them. Art. 8(2). Overhead is a commercial entity that presumably contracts regularly with other businesses. It strains credulity that a sophisticated commercial actor would see a reference to Terms and Conditions during a business negotiation and fail to understand that the terms were intended to apply to the contract. Moreover, the Order Acknowledgement was not the first time the standard terms were brought to Overhead's

attention: Blue Giant also mentioned (and linked to) its Terms and Conditions in its earlier price quotes. It should have been evident to Overhead that Blue Giant was providing the terms because it considered them relevant to the agreement being negotiated—why else would Blue Giant have repeatedly referenced the terms throughout the negotiating process?

Overhead likens this case to *CSS Antenna, Inc. v. Amphenol-Tuchel Electronics, GmbH*, 764 F. Supp. 2d 745 (D. Md. 2011), in which a district court applying the CISG found that the following reference failed to incorporate standard terms: "Our general conditions of delivery can be viewed or downloaded as.pdf [sic] file from our homepage: http://www.am-phenol.de." *Id*. at 754. But, unlike here, the reference to standard terms in *CSS Antenna* was misleading, describing the separate terms as "conditions of delivery." A reasonable party might not have understood from this statement that these were, in fact, general terms (including a forum selection clause) that applied to the entire purchase. *Id*. Overhead argues that similar ambiguity was present here because Blue Giant's reference to standard terms is preceded by a sentence about shipment timing. But this is hardly the most sensible interpretation of the Order Acknowledgement's text. The paragraph referring to standard terms opens with: "This document confirms receipt of your purchase order." Each subsequent sentence relates to a different aspect of the order, offering instructions on how orders must be confirmed and accepted and explaining how shipment will proceed upon order confirmation. Evaluated in context, there is no reason to think that the final sentence of this paragraph ("Terms and Conditions can be found at www.bluegiant.com/about-us/terms.") does not likewise relate to the purchase order as a whole.

Finally, Overhead claims that no evidence shows that it had actual knowledge of the terms—or even ever saw them. This argument might carry more weight had the terms themselves been available only upon request or had Blue Giant merely directed Overhead to a generic homepage that "need[ed] to be navigated in order for the standard conditions to be located." *Roser Techs., Inc. v. Carl Schreiber GmbH*, No. 11cv302, 2013 WL 4852314, at \*9 (W.D. Pa. Sept. 10, 2013). But that is not what happened here. By providing a direct link to the text of the relevant terms, Blue Giant gave Overhead reasonable opportunity to take notice of them. If Overhead overlooked or opted not to view the terms and thus lacked actual knowledge of them, that fact alone cannot release it from its obligations.

\*          \*          \*

To a party in Overhead's position, Blue Giant's intent in referencing and linking to its Terms and Conditions should have been reasonably clear. Under the CISG, a sophisticated commercial actor may not ignore conspicuous references to standard terms—as well as the text of the terms themselves—and then evade its contractual obligations by disclaiming knowledge of them. Because the standard terms were incorporated into the contract, the parties are obligated to resolve their dispute in accordance with the arbitration provision contained in the Terms and Conditions. Accordingly, we reverse and remand for further proceedings consistent with this opinion.

REVERSED AND REMANDED