**Opinion issued September 11, 2014**



In The

# Court of Appeals

For The

# First District of Texas

_____

**NO. 01-12-00949-CV**

_____

**HALLIBURTON COMPANY, Appellant**

**V.**

**KBR, INC., Appellee**

**On Appeal from the 165th District Court**
**Harris County, Texas**
**Trial Court Case No. 2012-39503**

## O P I N I O N

This case involves the arbitration of a dispute in which Halliburton Company claims to have overpaid its share of tax liabilities related to a corporate separation from its wholly-owned subsidiary, KBR, Inc. The parties agree that the dispute must be arbitrated, but they disagree as to which of two separate arbitration agreements governs certain aspects of the dispute. In this interlocutory appeal,

Halliburton presents two issues challenging the trial court's order denying its application to compel KBR to arbitrate all aspects of the dispute before a single accounting referee, as provided in the parties' Tax Sharing Agreement. Halliburton also presents a third issue responding to KBR's motion to dismiss this appeal.

We deny KBR's motion to dismiss this appeal. We affirm the trial court's order denying Halliburton's application to compel arbitration.

## Background Summary

In 2007, Halliburton spun off its wholly-owned subsidiary KBR. Before the spinoff, all financial transactions between the companies were recorded in an intercompany account as items payable or receivable. At the end of 2004, the account reflected that KBR owed Halliburton $1.2 billion. In October 2005, Halliburton contributed approximately $300 million of the intercompany account balance to KBR's equity in the form of a capital contribution and converted the remaining balance in the intercompany account into two long-term notes payable to Halliburton subsidiaries.

Preceding the 2007 corporate separation, Halliburton and KBR signed a number of contracts, including the parties' Master Service Agreement ("MSA"), entered into on November 20, 2006. It states, "[T]he parties intend to set forth in this Agreement, including . . . the Ancillary Agreements contemplated hereby, the

2

principal arrangements between [Halliburton and KBR] regarding the separation of the KBR Group from the Halliburton Group, the IPO [initial public offering] and certain future transactions."

One of the Ancillary Agreements referenced in the MSA is the Tax Sharing Agreement ("TSA"), entered into on November 15, 2006 and amended on February 26, 2007. The TSA provides, "[T]he Parties wish to set forth the general principles under which they will allocate and share various Taxes . . . and related liabilities" and further "to provide for the allocation between the Halliburton Group and the KBR Group of all responsibilities, liabilities and benefits relating to all Taxes paid or payable by either group" for the relevant taxable periods.

The MSA and the TSA each contain agreements to arbitrate. Paragraph, 7.1, found in Article VII of the MSA, reads as follows:

> 7.1 <u>Agreement to Arbitrate.</u> The procedures for discussion, negotiation and arbitration set forth in this Article VII shall be the final, binding and exclusive means to resolve, and shall apply to all disputes, controversies or claims (whether in contract, tort or otherwise) that may rise out of or relate to, or arise under or in connection with: (a) this Agreement and/or any Ancillary Agreement, (b) the transactions contemplated hereby or thereby, including all actions taken in furtherance of the transactions contemplated hereby or thereby on or prior to the date hereof, or (c) for a period of ten years after the IPO Closing Date, the commercial or economic relationship of the parties, in each case between or among any member of the Halliburton Group and the KBR Group. . . .

The arbitration article also provides that the arbitration will be conducted by a panel of three arbitrators from the American Arbitration Association ("AAA").

3

Paragraph 7.6(b) of the MSA provides that the AAA Panel has the authority to determine issues of arbitrability. It reads,

> The arbitrators shall have full power and authority to determine issues of arbitrability but shall otherwise be limited to interpreting or construing the applicable provisions of this Agreement, any Ancillary Agreement or any Prior Transfer Agreement, and will have no authority or power to limit, expand, alter, amend, modify, revoke or suspend any condition or provision of this Agreement, any Ancillary Agreement or any Prior Transfer Agreement . . . .

The TSA's arbitration provision, found in Section 8.11, requires that "[a]ny disagreement between [KBR and Halliburton] with respect to any matter that is the subject of this Agreement, including, without limitation, any disagreement with respect to any calculation or other determinations by Halliburton hereunder . . . shall be resolved by a nationally recognized independent accounting firm chosen by and mutually acceptable to the Parties." Under this provision, arbitration would be conducted by a single person from an accounting firm, known as an Accounting Referee. In contrast to the MSA, the TSA contains no provision addressing determinations of arbitrability.

After the corporate separation, a dispute arose between the two companies regarding whether Halliburton had paid more than its required share of tax liabilities for certain years preceding the corporate spinoff. During each pre-spinoff year, Halliburton had filed a single, consolidated tax return for itself and its

4

subsidiaries, including KBR. Even though a consolidated return was filed, the tax liabilities were allocated between the two companies.

In 2011, Halliburton notified KBR that it had determined, pursuant to the TSA, that it had paid more than its share of tax liabilities for a number of pre-separation years. Halliburton claimed that the amount of the overpayment was approximately $256 million. It sought reimbursement from KBR for that amount.

KBR pointed out that Halliburton had paid the funds for its share of the tax liabilities into the intercompany account. It asserted that the account had been settled in anticipation of the corporate spinoff. KBR claimed that, contrary to Halliburton's position, under the circumstances, there was no basis in the TSA for Halliburton to reopen the settled account or to reallocate and recalculate tax liabilities that were paid based on filed tax returns.

Ultimately, the companies could not agree on a resolution of Halliburton's overpayment claim. In January 2012, Halliburton sent a notice to KBR, requesting the appointment of an Accounting Referee, as provided in the TSA, "to resolve the disputes between the parties concerning the amounts owed by KBR to Halliburton under the TSA."

KBR responded that Halliburton's request for an Accounting Referee to calculate—under the methods prescribed in the TSA—the amount of tax obligations owed by Halliburton for the pre-spinoff tax years was premature. KBR

5

averred that first a determination had to be made whether Halliburton was entitled to pursue a claim to recover funds that it had paid into the intercompany account. KBR asserted that this preliminary determination was governed by provisions in the MSA.[1]

To support its position, KBR pointed to a release provision in the MSA. The provision states that KBR is released from liability for claims arising from acts or events that occurred prior to, or in association with, the corporate spinoff, unless such claims were specifically preserved in another agreement. KBR recognized that Halliburton claimed that it was entitled to reimbursement under the TSA. KBR alleged, however, that Halliburton had not pointed to any provision in the TSA that preserved Halliburton's claim for reimbursement of monies paid into the settled intercompany account. Because the claim arises from pre-spinoff events and was not preserved in another agreement, KBR argued it was covered by the MSA's release provision.

KBR also asserted that Halliburton's reimbursement claim was barred by the limitations provision in the MSA. That provision requires a party to give notification that it seeks to arbitrate a claim within two years of when a party knew or should have known of the claim.

---

[1] KBR agreed that certain discrete tax claims between the parties, aside from the $256 million overpayment claim, were governed by the Tax Sharing Agreement and could be resolved by an Accounting Referee. However, those claims are not involved in this appeal.

In addition, KBR cited the 2005 settlement of the intercompany account. In settling the account, Halliburton had contributed approximately $300 million of the intercompany account balance to KBR's equity in the form of a capital contribution and converted the balance in the intercompany account into two long-term notes payable to Halliburton. KBR averred that, because it had paid the notes in full, Halliburton's overpayment claim was barred by the principle of accord and satisfaction.

KBR served Halliburton with a demand for arbitration under the MSA. In the demand, KBR requested the AAA Panel declare (1) Halliburton's overpayment claim for $256 million was discharged when KBR paid the notes it owed for settlement of the intercompany account; (2) Halliburton released its overpayment claim pursuant to the release provisions of the MSA; and (3) Halliburton's overpayment claim is time-barred under the MSA's limitations provision.

Halliburton maintained its position that all aspects of the dispute, including whether it is entitled to pursue reimbursement from KBR, are within the scope of TSA's arbitration provision. Unable to reach an agreement with KBR regarding which agreement's arbitration provision controlled, Halliburton filed an application in the trial court to compel arbitration under the TSA and to stay any proceedings under the MSA. Among its arguments, Halliburton asserted that the trial court, not the AAA Panel, should determine which arbitration agreement controls the

7

resolution of the discrete dispute regarding whether Halliburton is entitled to pursue the overpayment claim.

KBR responded to Halliburton's application and filed a cross-motion to compel arbitration under the MSA. In its filing, KBR asserted that the AAA Panel should determine which arbitration agreement controls the discrete dispute. KBR cited the section of the MSA, which provides that the AAA Panel has full power to determine issues of arbitrability. Halliburton replied, asserting that, regardless of whether it is permitted to determine issues of arbitrability under the MSA, the AAA Panel is not authorized to determine whether the dispute is arbitrable under the TSA.

The trial court conducted a hearing on the parties' competing arbitration motions. Two days later, on September 19, 2012, the trial court signed an order denying Halliburton's application to compel arbitration under the TSA and to stay proceedings under the MSA. In the same order, the trial court granted KBR's cross-motion to compel arbitration under the MSA.

Halliburton appeals the trial court's order denying its application to compel arbitration under the TSA. Halliburton presents three issues in its appellate brief.

While the interlocutory appeal was pending in this Court, arbitration proceeded before the AAA Panel under the MSA, as ordered by the trial court. In its written arbitration award, the AAA Panel (1) held that it "ha[d] jurisdiction over

the claims presented"; (2) held that "Halliburton's TSA claims are barred by § 7.3(b) of the MSA"; and (3) ordered "the parties to return to the Accounting Referee within 30 days of the Final Award for determination of the Parties' remaining TSA claims." Halliburton submitted its TSA claims to the Accounting Referee, who determined that "Halliburton is owed a net amount of $104,525,604 from KBR under the TSA."

In the trial court, Halliburton filed a motion to vacate the AAA Panel's award. *See* 9 U.S.C. § 10. Halliburton asserted that the award should be vacated because the AAA Panel did not have jurisdiction to determine its own jurisdiction to arbitrate the dispute or to decide any part of the dispute under the MSA. Halliburton maintained that the entire dispute should be decided under the TSA. The motion to vacate the award remains pending in the trial court.

## Appellate Jurisdiction

KBR has moved to dismiss this appeal for lack of jurisdiction, asserting that the trial court's order is not appealable. Halliburton responds to the motion in its third issue, asserting that this Court has jurisdiction over the denial of its application to compel arbitration. The parties have also filed post-submission briefing regarding additional jurisdictional issues. Because it is a threshold matter, we consider the jurisdictional issues first before discussing the merits of the appeal. *See CMH Homes v. Perez*, 340 S.W.3d 444, 447 (Tex. 2011).

9

## A.    Final Judgment or Interlocutory Appeal

Halliburton first asserts that the trial court's order is appealable because it is a final judgment, not an interlocutory order. An order is final and appealable only if "it actually disposes of every pending claim and party or . . . it clearly and unequivocally states that it finally disposes of all claims and all parties." *Lehmann v. Har–Con Corp.*, 39 S.W.3d 191, 205 (Tex. 2001). The trial court's September 19, 2012 order does not contain finality language. Nevertheless, Halliburton argues that the order is a final judgment because all claims asserted by the parties in the trial court have been disposed of in the September 19, 2012 order. It asserts that the only claims raised by the parties in the trial court were the competing claims regarding the appropriate arbitral forum. Halliburton argues that, because it disposes of these claims, the order is a final judgment for purposes of appeal. We disagree.

The competing filings in the trial court show that Halliburton had a live claim against KBR when the trial court signed the order denying Halliburton's application to compel arbitration under the TSA. To be sure, there would be no need for arbitration if all claims between the parties had been resolved when the order was signed. Although Halliburton's motion to vacate the Accounting Referee's award is currently pending in the trial court, no final judgment has been signed confirming the award. Because it does not dispose of all issues remaining

between the parties, but instead contemplates continuing resolution of Halliburton's overpayment claim against KBR through the arbitration process, we conclude that the trial court's order denying Halliburton's application to compel arbitration is an interlocutory order. *See Brook v. Pep Boys Auto. Supercenters, Inc.*, 104 S.W.3d 656, 660 (Tex. App.—Houston [1st Dist.] 2003, no pet.).

## B. Appealability of Interlocutory Order

"Unless a statute authorizes an interlocutory appeal, appellate courts generally only have jurisdiction over final judgments." *CMH Homes*, 340 S.W.3d at 447. "We strictly apply statutes granting interlocutory appeals because they are a narrow exception to the general rule that interlocutory orders are not immediately appealable." *Id.* KBR asserts that the order is not an appealable interlocutory order under any statute.

The parties agree that the Federal Arbitration Act ("FAA") governs both arbitration agreements involved in this dispute. When a matter is subject to the FAA, a party may appeal an order "under the same circumstances that an appeal from a federal district court's order or decision would be permitted" by section 16 of the FAA. TEX. CIV. PRAC. & REM. CODE ANN. § 51.016 (Vernon Supp. 2013); *see CMH Homes*, 340 S.W.3d at 448.

Section 16 of the FAA provides that an appeal may be taken from an order "denying a petition under section 4 of this title to order arbitration to proceed." 9

11

U.S.C. § 16(a)(1)(B). Section 16 further provides that an appeal may not be taken from an interlocutory order compelling arbitration. 9 U.S.C. § 16(b)(3).

Asserting that the appeal must be dismissed, KBR points out that the general purpose of FAA section 16 is to permit the immediate appeal of orders that are hostile to arbitration. *See CMH Homes*, 340 S.W.3d at 451 n.7. KBR argues that the trial court's order is not hostile to arbitration because it requires the parties to arbitrate under the MSA. KBR characterizes the order as an order compelling arbitration. KBR asserts that the denial of Halliburton's application to arbitrate was only a "necessary consequence" of the trial court's grant of KBR's motion to compel arbitration under the MSA. KBR points out that section 16 states that an order compelling arbitration is not immediately appealable. *See* 9 U.S.C. § 16(b)(3). However, it is the substance and function of the order viewed in the context of the record that controls our interlocutory jurisdiction, not KBR's characterization of the order. *See Schlumberger Technology Corp. v. Baker Hughes Inc.*, 355 S.W.3d 791, 800 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (holding that order granting Baker Hughes's motion to compel arbitration under one agreement, but denying Schlumberger's motion for arbitration under different agreement, was an appealable interlocutory order).

In the context of this record, we conclude that the substance and function of the order in this case supports its characterization as one denying a motion to

12

compel arbitration. *See* 9 U.S.C. § 16(a)(1)(B). Here, when KBR refused to arbitrate pursuant to the terms of the TSA, Halliburton petitioned the trial court to enforce its alleged contractual right to have arbitration proceed pursuant to the terms of TSA. Thus, "[t]he trial court considered two related arbitration agreements, granted a motion seeking to compel arbitration under one of them, and denied a motion seeking to compel arbitration under the other." *Schlumberger*, 355 S.W.3d at 800. Despite ordering arbitration to proceed under the MSA, the trial court specifically denied Halliburton's asserted contractual right to arbitrate under the terms of the TSA. *See id.* Based on the trial court's characterization of Halliburton's application as one to compel arbitration, its express denial of the application, and the resulting denial of Halliburton's asserted contractual right to arbitrate under the TSA, we conclude that the trial court's order is an appealable order under FAA section 16. *See id.*; *see also* 9 U.S.C. § 16(a)(1)(B); *Tex. La Fiesta Auto Sales, LLC v. Belk*, 349 S.W.3d 872, 878 (Tex. App.—Houston [14th Dist.] 2011, no pet.); *McReynolds v. Elston*, 222 S.W.3d 731, 738 (Tex. App.—Houston [14th Dist.] 2007, no pet.).

## C.     Expert Determination versus Arbitration

KBR has filed a post-submission brief in which it asserts that the process by which the Accounting Referee resolves Halliburton's claims under the TSA is not arbitration, but rather, is an expert determination. For this reason, KBR asserts that

13

Halliburton is not entitled to interlocutory appeal of its order denying its motion to compel arbitration under the TSA because, if the resolution of the dispute under the TSA is not arbitration, then Halliburton is not entitled to relief under the FAA, including an interlocutory appeal. *See* 9 U.S.C. § 16(a)(1)(B).

We examine federal case law to determining whether resolution of the dispute under the TSA constitutes arbitration for purposes of the FAA. *See CMH Homes*, 340 S.W.3d at 449 ("[A]n interlocutory appeal in this case is permitted only if it would be permitted under the same circumstances in federal court under section 16."); *see also Little v. Tex. Dep't of Crim. Justice*, 148 S.W.3d 374, 382 (Tex. 2004) (examining federal law when interpreting state statute that incorporates federal statute).

KBR and Halliburton both rely on *Fit Tech, Inc. v. Bally Total Fitness Holding Corp.*, 374 F.3d 1 (1st Cir. 2004) as authority for their respective positions in which they assert that the alternate dispute resolution provision in the TSA is, or is not, an arbitration provision. We agree that *Fit Tech* is instructive because it involved the question of whether an "accountant remedy" provision was an arbitration provision. *See id.* at 6.

In *Fit Tech*, the court reasoned that whether the accountant remedy is arbitration "does not depend on nomenclature used in the agreement"; rather it depends on "how closely the specified procedure resembles classic arbitration and

14

whether treating the procedure as arbitration serves the intuited purposes of [the legislature]." *Id.* at 7. The court held that "the common incidents of arbitration of a contractual dispute" include the following: (1) whether the remedy is "final"; (2) whether it involves an "independent adjudicator"; (3) whether there are "substantive standards"; and (4) whether there is "an opportunity for each side to present its case." *Id.*

The court concluded that "this is arbitration in everything but name." *Id.* In reaching its conclusion, the court remarked that "[s]electing an expert to handle arbitration is by no means uncommon." *Id.* at 6 n.4. Supporting its conclusion, the court noted that the accountant remedy is "final." *Id.* at 7. The court also observed that the accountant remedy incorporates "common incidents of arbitration of a contractual dispute." *Id.* Specifically, an "independent adjudicator" determines the remedy, and the agreement contains "substantive standards" for the remedy. *Id.* Because the accountant remedy would be decided on the parties' written submissions, each side has an opportunity to present its case. *Id.*

The *Fit Tech* court observed that the accountant remedy has an uncommon feature: it is limited to resolving accounting issues; thus, non-accounting disputes between the parties could not be resolved by the accounting remedy. However, the court stated that "arbitrations sometimes do cover only a part of the overall dispute between the parties." *Id.*

15

In this case, the following provision sets forth the procedure for the Accounting Referee to resolve certain disputes under the TSA:

Section 8.11 *Resolution of Certain Disputes*. Any disagreement between the Parties with respect to any matter that is the subject of this Agreement, including, without limitation, any disagreement with respect to any calculation or other determinations by Halliburton hereunder, which is not resolved by mutual agreement of the Parties, shall be resolved by a nationally recognized independent accounting firm chosen by and mutually acceptable to the Parties hereto (an "Accounting Referee"). Such Accounting Referee shall be chosen by the Parties within fifteen (15) business days from the date on which one Party serves written notice on the other Party requesting the appointment of an Accounting Referee, provided that such notice specifically describes the calculations to be considered and resolved by the Accounting Referee. In the event the Parties cannot agree on the selection of an Accounting Referee, then the Accounting Referee shall be any office or branch of the public accounting firm of Deloitte & Touche. The Accounting Referee shall resolve any such disagreements as specified in the notice within thirty (30) days of appointment; provided, however, that no Party shall be required to deliver any document or take any other action pursuant to this Section 8.11 if it determines that such action would result in the waiver of any legal privilege or any detriment to its business. Any resolution of an issue submitted to the Accounting Referee shall be final and binding on the Parties hereto without further recourse. The Parties shall share the costs and fees of the Accounting Referee equally.

As in *Fit Tech*, we conclude that the procedure outlined in Section 8.11 of the TSA "is arbitration in everything but name" because it has the "common incidents" of arbitration. *See id.* Section 8.11 meets the four-prong *Fit Tech* test for determining whether a dispute-resolution process is arbitration. As to the first three prongs, Section 8.11 provides for a "final and binding" determination by an

16

"independent" accounting firm in accordance with the "substantive standards" set forth in the TSA. *See id.* Thus, these prongs are met.

As to the fourth prong, KBR asserts that Section 8.11 does not provide an opportunity for each side to present its case because it does not contemplate an evidentiary hearing or discuss discovery. Halliburton correctly points out that the accounting remedy in *Fit Tech* also did not provide for an evidentiary hearing or discovery. Nonetheless, the court held that each side was presented an "opportunity to be heard" because the accountant remedy was based on the parties' "written submissions." *See id.*

Here, Section 8.11 provides that the Accounting Referee will resolve "[a]ny disagreement between the Parties with respect to any matter that is the subject of [the TSA Agreement]," as provided in a party's "written notice," which must "specifically describe[] the calculations to be considered and resolved by the Accounting Referee." The provision also contemplates at least some form of discovery because it states, "[N]o Party shall be required to deliver any document or take any other action pursuant to this Section 8.11 if it determines that such action would result in the waiver of any legal privilege or any detriment to its business." These requisites provide an opportunity for the parties to present their respective cases to the Accounting Referee that is comparable to the *Fit Tech* provision, which specified that the accounting remedy would be based on the

17

"written submissions" of the parties. *See id.* In short, the dispute resolution process outlined in Section 8.11 is not, as KBR asserts, an expert determination; rather, it is a form of arbitration. *See id.*; *see also Harker's Distribution, Inc. v. Reinhart Foodservice, L.L.C.*, 597 F.Supp.2d 926, 939–41 (N.D. Iowa 2009) (holding that an "accounting remedy" is arbitration); *Hodges v. MedAssets Net Revenue Systems*, No. 1:07–cv–2985–WSD, 2008 WL 476140, at *3 (N.D. Ga. Feb. 19, 2008) (determining that the resolution clause, providing that "any disputes" would be submitted to independent accounting firm, was a form of final and binding arbitration).

## D.    Mootness of Appeal

In post-submission briefing, KBR and Halliburton also addressed whether this interlocutory appeal is moot because the parties have arbitrated their dispute since this appeal was filed. KBR asserts that the appeal is moot "because the district court will consider the same arguments presented in this appeal when it decides Halliburton's motion to vacate" the AAA Panel's award made pursuant to the MSA.

We disagree that the trial court's consideration of the same issues in determining the motion to vacate as have been raised in this interlocutory appeal renders this appeal moot. To the contrary, an appeal becomes moot only "when the court's action on the merits cannot affect the rights of the parties." *VE Corp. v.*

18

*Ernst & Young*, 860 S.W.2d 83, 84 (Tex. 1993). Here, the disposition of this appeal has the potential to affect the rights of the parties with respect to the trial court's decision on Halliburton's motion to vacate the arbitration award.

In support of its vacatur motion, Halliburton asserts, as it does in this appeal, that the AAA Panel was without jurisdiction to determine issues of arbitrability with respect to a determination of its own jurisdiction to decide the defensive issues raised by KBR. As discussed *infra*, our determination of whether the AAA Panel has jurisdiction to arbitrate issues of arbitrabilty regarding the parties' claims is also dispositive of this interlocutory appeal. For this reason, our decision on the merits in this appeal has the potential to determine the pending motion to vacate. *See, e.g., Northwest Independent School Dist. v. Carroll Independent School Dist.*, No. 02-10-00105-CV, 2014 WL 2770488, *2 (Tex. App.—Fort Worth June 19, 2014, no pet.) (holding that decision on question of law in earlier, interlocutory appeal was "law of the case" in subsequent appeal from final judgment). In other words, our action on the merits in this appeal *can* affect the rights of the parties in this case. *See VE Corp.*, 860 S.W.2d at 84. Thus, we hold that this appeal is not moot. *See id.*

### E.    Conclusion Regarding Jurisdiction

For the reasons discussed, we hold that we have jurisdiction over this interlocutory appeal. *See* TEX. CIV. PRAC. & REM. CODE § 51.016; 9 U.S.C.

19

§ 16(a)(1)(B). We deny KBR's motion to dismiss and sustain Halliburton's third issue.

## Denial of Halliburton's Motion to Compel Arbitration

In its first issue, Halliburton asserts that the trial court erred by denying its application to compel arbitration under the TSA and concomitantly granting KBR's cross-motion to compel arbitration under the MSA. The first issue addresses the threshold dispute of who decides issues of arbitrability in this case: the AAA Panel or the court. Halliburton points out that the TSA does not expressly reserve issues of arbitrability for the arbitrator. In other words, the TSA is silent regarding who determines whether a dispute is arbitrable under the TSA. For this reason, Halliburton asserts that only the court may decide whether KBR's defensive claims should be decided by the Accounting Referee under the TSA or whether the defensive claims should be decided by the AAA Panel under the MSA. In contrast, KBR points out that the MSA expressly states that the AAA Panel will determine issues of arbitrability.

If KBR is correct that the AAA Panel may determine the arbitrability of the dispute, then the trial court properly denied Halliburton's application to compel arbitration under the TSA and properly granted KBR's cross-motion to compel arbitration before the AAA Panel pursuant to the MSA. Thus, we first determine

20

whether the AAA Panel had authority to arbitrate issues of arbitrability involving the TSA in this case.[2]

## A.    AAA Panel's Authority to Determine Arbitrability Issue

Threshold questions of arbitrability are to be resolved by courts unless the parties clearly and unmistakably agree to submit these issues to arbitration.

---

[2]    Halliburton argues that "arbitrability" is not at issue here because the parties agree that the claims should be arbitrated. The controversy concerns who should decide whether KBR's defensive claims are arbitrated under the TSA by the Accounting Referee or under the MSA by the arbitrators. Halliburton asserts that a "who should decide question" is not a question of arbitrability. We disagree. In *Howsam v. Dean*, the United States Supreme Court defined the phrase "questions of arbitrability" to encompass

> the kind of narrow circumstance where contracting parties would likely have expected a court to have decided the gateway matter, where they are not likely to have thought that they had agreed that an arbitrator would do so, and, consequently, where reference of the gateway dispute to the court avoids the risk of forcing parties to arbitrate a matter that they may well not have agreed to arbitrate.

*Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83, 123 S. Ct. 588, 592 (2002). As examples of such "questions of arbitrability," the Court cited cases involving disputes about whether an arbitration contract bound parties who did not sign the agreement (*First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943–44, 115 S. Ct. 1920, 1924 (1995)), whether an arbitration agreement survived a corporate merger and bound the resulting corporation (*John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 547, 84 S. Ct. 909, 913 (1964)), and whether an arbitration clause, in a concededly binding contract, applied to a particular type of controversy *(AT&T Techs., Inc. v. Commc'ns Workers*, 475 U.S. 643, 649, 106 S. Ct. 1415, 1419 (1986)). *See id.* at 84, 123 S. Ct. at 592. In short, issues of contract formation with respect to arbitration are typically questions of arbitrability. *See Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 561 U.S. 287, 297, 130 S. Ct. 2847, 2856 (2010). Here, the issue of whether KBR's defensive claims should be arbitrated under the MSA or under the TSA fits into this rubric. It is an issue of arbitrability.

*Schlumberger*, 355 S.W.3d at 802 (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943, 115 S. Ct. 1920, 1923 (1995); *In re Weekley Homes, L.P*., 180 S.W.3d 127, 130 (Tex. 2005)). Here, the determination of whether the parties agreed to submit the arbitrability of KBR's defensive claims to the AAA Panel depends on an interpretation of the parties' contracts, which we review de novo. *See id.* (citing *In re Dillard Dep't Stores, Inc.*, 186 S.W.3d 514, 515 (Tex. 2006); *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003)).

To support its position that the arbitrators are empowered to decide under which agreement the entire dispute should be arbitrated, KBR points to the following provisions in the MSA:

ARTICLE VII
ARBITRATION; DISPUTE RESOLUTION

7.1 <u>Agreement to Arbitrate.</u> **The procedures for discussion, negotiation and arbitration set forth in this Article VII shall be the final, binding and exclusive means to resolve, and shall apply to all disputes, controversies or claims** (whether in contract, tort or otherwise) **that may rise out of or relate to, or arise under or in connection with:** (a) this Agreement and/or **any Ancillary Agreement**, (b) the transactions contemplated hereby or thereby, including all actions taken in furtherance of the transactions contemplated hereby or thereby on or prior to the date hereof, or (c) for a period of ten years after the IPO Closing Date, the commercial or economic relationship of the parties, in each case between or among any member of the Halliburton Group and the KBR Group. . . .

. . . .

22

7.6 Discovery and Certain Other Matters

. . . .

> (b) **The arbitrators shall have full power and authority to determine issues of arbitrability** but shall otherwise be limited to interpreting or construing the applicable provisions of this Agreement, any Ancillary Agreement or any Prior Transfer Agreement, and will have no authority or power to limit, expand, alter, amend, modify, revoke or suspend any condition or provision of this Agreement, any Ancillary Agreement or any Prior Transfer Agreement . . . .

(Emphasis added.) Read in context, the arbitrability provision found in MSA Article 7.6(b) shows a clear and unmistakable intent by the parties to allow the AAA Panel to determine whether a dispute is arbitrable under the MSA or under an ancillary agreement, such as the TSA. Nonetheless, Halliburton argues that the MSA's arbitrability provision has no application to the determination of whether the parties' entire dispute should be arbitrated under the TSA because the MSA and TSA "are complete and separate contracts."

Halliburton points out that the TSA is entirely silent regarding who determines issues of arbitrability, which includes the determination of whether the TSA arbitration clause applies to the resolution of KBR's defensive issues. Halliburton relies on the legal precept that, when an arbitration agreement is silent about who determines issues of arbitrability, the court, rather than the arbitrator, determines the issue. *See In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 643 (Tex. 2009). It is on this basis that Halliburton asserts that the court, rather than

23

the AAA Panel, has the authority to determine whether KBR's defensive issues fall within the scope of the the TSA's or MSA's arbitration provision.

KBR responds that the TSA and the MSA are not "complete and separate" agreements. Instead, the two agreements must be construed as a single, integrated contract. KBR points out that the MSA and TSA each provide that it "shall be governed and construed in accordance with Delaware law." Delaware courts have embraced the principle that agreements executed in close temporal proximity by the same parties in connection with a single business transaction are to be harmonized and construed together as a single contract. *See, e.g., E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1115 (Del. 1985) ("Where two agreements [relating to one transaction] are executed on the same day and are coordinated to the degree outlined above, in essence, they form one contract and must be examined as such."); *Martin Marietta Materials, Inc. v. Vulcan Materials Co.*, 56 A.3d 1072, 1119 (Del. Ch. 2012) ("[T]he JDA and the NDA are interrelated agreements that relate to the same course of commercial activity and so should be read together and harmonized despite the two week time difference between their effective dates.")[3]; *Ashall Homes Ltd. v. ROK Entm't Grp. Inc.*, 992

---

[3] In *Martin Marietta Materials, Inc. v. Vulcan Materials Co.*, 56 A.3d 1072, 1119 n.192 (Del. Ch. 2012), the court also cited the following authority: RESTATEMENT (SECOND) OF CONTRACTS § 202(2) (1981) ("A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together."); 17A C.J.S. CONTRACTS § 315, at 337 (1999) ("In the absence of anything to

24

A.2d 1239, 1248 (Del. Ch. 2010) (reading related contemporaneous agreements together because they effectuated separate steps of single integrated transaction); *Baypo Ltd. P'ship v. Tech. JV, LP*, 940 A.2d 20, 27 (Del. Ch. 2007) (recognizing that agreements, contemporaneously executed as part of one business transaction, must be read together as one document); *Karish v. SI Int'l, Inc.*, No. Civ. A. 19501, 2002 WL 1402303, at *3 (Del. Ch. June 24, 2002) (same).

Here, we agree with KBR that the MSA and the TSA must be harmonized and construed together as one contract. The agreements, between the same parties, signed five days apart, are facets of the same transaction entered into for the unitary purpose of effectuating the corporate separation of KBR from Halliburton.

Each agreement provides an integral component to the transaction. The MSA is the broader umbrella agreement, providing the structure for the corporate separation, while the TSA sets out the more technical principles by which KBR and Halliburton will allocate and share tax liabilities in the context of the corporate separation. Although the parties used the MSA and a number of ancillary agreements to govern the various aspects of the corporate spinoff, the MSA and the

---

indicate a contrary intention, writings executed at the same time and relating to the same transaction are construed together as a single contract, as though they were as much one in form as they are in substance, in order to determine the intent, rights, and interests of the parties."); 11 WILLISTON ON CONTRACTS § 30:26 (4th ed. 1999) ("[I]nstruments executed at the same time, by the same contracting parties, for the same purpose, and in the course of the same transaction will be considered and construed together as one contract or instrument, even though they do not in terms refer to each other.").

TSA were each dependent on the entire transaction. In other words, the agreements were vital and interrelated parts of one deal. Indeed, each agreement anticipates and contemplates the execution of the other. The MSA recites, "[T]he parties intend to set forth in this Agreement, including the Schedules hereto *and the Ancillary Agreements contemplated hereby*, the principal arrangements between and among them and the members of their respective Groups regarding the separation of the KBR Group from the Halliburton Group, the IPO and certain future transactions." (Emphasis added.) The MSA specifically defines the TSA as an ancillary agreement. Thus, the MSA and TSA should be read together as one integrated agreement.

Halliburton asserts that, even when the two agreements are read together, a conflict nonetheless exists between the arbitration provisions of the TSA and of the MSA. In support of this position, Halliburton cites the following TSA provision, which it asserts precludes the application of the MSA's arbitrability provision to arbitration sought under the TSA's arbitration clause:

Section 8.16 <u>Entire Agreement; Termination of Prior Agreements</u>.

(a) This Agreement contains the entire agreement between the Parties with respect to the subject matter hereof and supersedes all other agreements, whether or not written, in respect of any Tax . . . .

(b) Without limiting the foregoing, the Parties acknowledge and agree that in the event of any conflict or inconsistency between the provisions of this Agreement and the provisions of the Master Separation Agreement or the Master Separation and Distribution

26

Agreement (as applicable), the provisions of this Agreement shall take precedence and to such extent shall be deemed to supersede such conflicting provisions under the Master Separation Agreement or the Master Separation and Distribution Agreement . . . .

Halliburton also relies on the following provision of the MSA:

9.2 Conflicting Agreements; Entire Agreement

 . . . Except as otherwise expressly provide herein, in the event of a conflict between this Agreement and any Prior Transfer Agreement, any Ancillary Agreement or any agreement set forth on Schedule 9.2 hereto, the provisions of such Prior Transfer Agreement, such Ancillary Agreement or such agreement set forth on Schedule 9.2 hereto, as applicable, shall prevail over the provisions hereof.

The above provisions specify that the TSA supersedes the MSA with respect to the subject matter of the TSA and, concomitantly, to the extent that the provisions of the two agreements conflict or present inconsistencies. Halliburton avers that a conflict exists between the TSA's and the MSA's arbitration provisions. Halliburton intimates that the TSA's complete silence regarding the issue of arbitrability creates a conflict with the MSA's express provision, which mandates that issues of arbitrability be decided by the AAA Panel.

We disagree with Halliburton's reading. The TSA's silence on the subject of arbitrabilty does not present a conflict with the MSA when, as discussed, the two agreements must be read as one, integrated contract. To the contrary, when the agreements are read as one contract, entered into to effectuate a singular

27

transaction, the TSA's silence regarding arbitrability reinforces the application of the MSA's arbitrability clause to arbitration sought under the TSA.

In contrast to the TSA's silence, the MSA's arbitration provision expressly addresses arbitrability. It states, "The procedures for . . . arbitration set forth in this Article [] shall be the final, binding and exclusive means to resolve, and shall apply to all disputes, controversies or claims . . . that may rise out of or relate to, or arise under or in connection with . . . any Ancillary Agreement," including the TSA.

Halliburton correctly points out that the parties specifically reserved for arbitration under the TSA "[a]ny disagreement between the Parties with respect to any matter that is the subject of [the TSA]." This corresponds to TSA section 8.16(a), which provides, "This Agreement contains the entire agreement between the Parties with respect to the subject matter hereof . . . ."

In making its argument that the MSA and TSA arbitration provisions conflict, Halliburton fails to account for the limiting "subject matter" language contained in the TSA; that is, it fails to account for the fact that the TSA supersedes the MSA only as to the subject matter of the TSA. To aid in the determination of what constitutes the "subject matter" of the TSA, we turn to the Tax Sharing Agreement's opening provisions, which state: "[T]he Parties wish to set forth the general principles under which they will allocate and share various Taxes . . . and related liabilities" and "to provide for the allocation between the

28

Halliburton Group and the KBR Group of all responsibilities, liabilities and benefits relating to all Taxes paid or payable by either group" for the relevant taxable periods. In short, the subject matter of the agreement is the allocation and sharing of taxes and tax liabilities between parties incident to the corporate spin-off.

The MSA's arbitrability provision, specifying that the AAA Panel will decide issues of arbitrability, is neither "the subject matter" of the TSA nor does it conflict with the TSA's arbitration provision, which is silent regarding issues of arbitrability. Admittedly, the provisions cited by Halliburton require that no express provision of the TSA be overridden by that of the MSA; however, the cited provisions do not reflect any intent to disrupt or to negate the effects of the subject matter expressly included in the MSA but not addressed in the TSA. Such subject matter addressed in the MSA includes who decides issues of arbitrability. Specifically, the parties expressly agreed in the MSA that "[t]he arbitrators shall have full power and authority to determine issues of arbitrability . . . ."

Reading the TSA and MSA as one, integrated agreement, we conclude that the AAA Panel was the proper tribunal to determine whether KBR's defensive claims should be arbitrated under the TSA or under the MSA. No conflict exists between the TSA and MSA with respect to the issue of arbitrability, which is not addressed in the TSA. We make no determination whether KBR's defensive

claims fall within the scope of the TSA arbitration provision or within the MSA arbitration provision. That determination is one of arbitrability reserved for the arbitrators in this case.

We hold that the trial court could have properly determined that the AAA Panel was authorized, under the MSA arbitrability provision, to determine its own jurisdiction to arbitrate KBR's defensive claims. Thus, we further hold that the trial court did not err in denying Halliburton's application to compel arbitration.

We overrule Halliburton's first issue.[4]

## Conclusion

We deny KBR's motion to dismiss the appeal. We affirm the trial court's order denying Halliburton's application to compel arbitration.

Laura Carter Higley
Justice

Panel consists of Justices Jennings, Keyes, and Higley.

---

[4] Because Halliburton's first issue is dispositive of this interlocutory appeal, we do not reach Halliburton's second issue, which challenges other possible grounds on which to uphold the trial court's order.