Filed 12/10/24

VERMONT SUPERIOR COURT

Chittenden Unit
175 Main Street
Burlington VT 05401
802-863-3467
www.vermontjudiciary.org



CIVIL DIVISION
Case No. 22-CV-03042

Reconciled It, Inc. v. Ian Bouchett et al

## **DECISION ON MOTION FOR SUMMARY JUDGMENT**

Plaintiff Reconciled It, Inc., ("Reconciled") filed this action, alleging that its former employee, Defendant Ian Bouchett, breached various obligations by starting a competing business and engaging in other activities while he was still working for Reconciled. Reconciled also alleges that Mr. Bouchett's company, Defendant Ledgr, Inc. ("Ledgr"), tortiously interfered with Reconciled's employment agreement with Mr. Bouchett. Mr. Bouchett asserts counterclaims against Reconciled and its founder, Michael Ly. Reconciled and Mr. Ly move for summary judgment on all claims. The court denies the motion in substantial part, and grants it in part.

Undisputed Facts

The parties agree to the following facts. Reconciled is an internet-based company that provides accounting services and business-related consultation and advice to small businesses. Michael Ly is Reconciled's founder and CEO; he hired Mr. Bouchett as a salesman in 2018. In December 2021, Mr. Ly promoted Mr. Bouchett to the positions of President and Chief Revenue Officer. Mr. Bouchett signed an employment agreement describing his position, compensation, and benefits, with a separate Proprietary Information and Inventions Agreement. In the paragraph describing his position, the agreement states:

> While you render services to the Company, you will not engage in other employment, consulting, or other business activity that would create a conflict of interest with the Company.

The Proprietary Information and Inventions Agreement includes restrictions on Mr. Bouchett's activities both during and after his employment. Restrictions during employment include the following:

> During my employment with the Company, I will not directly or indirectly: (1) Cause any person to leave their employment with the Company (other than terminating

subordinate employees in the course of my duties for the Company); (ii) Solicit any Business Partner; (iii) act in Any Capacity in or with respect to any commercial activity which competes, or is reasonably likely to compete, with any business that the Company conducts, proposes to conduct or demonstrably anticipates conducting, at any time during my employment (a "Competing Business") . . . .

Restrictions after employment include the following:

For the period of twelve (12) months immediately following termination of my employment with the Company (for any or no reason, whether voluntary or involuntary), I will not directly or indirectly: (1) Cause any person to leave their employment with the Company; or (ii) Solicit any Business Partner.

Mr. Bouchett was Reconciled's President until May 23, 2022. Mr. Bouchett informed Mr. Ly of his intention to leave Reconciled and signed a letter of resignation dated July 25. In the letter, Mr. Bouchett wrote: "My last day of employment will be August 26th, 2022, with my final day of work being August 5th (prior to my scheduled PTO)."

On June 30, Mr. Bouchett incorporated Ledgr, Inc. Also on June 30, Mr. Bouchett spoke with Mateusz Kozlowski, who invested in Ledgr on August 15. On July 21, Mr. Bouchett downloaded 10,523 records from the Reconciled database and sent them to his personal email account. Between August 5 and 26, Mr. Bouchett created a document the parties refer to as a Pitch Deck. On or about August 16, Mr. Ly sent a Slack message to Reconciled employees explaining that he had discovered that Mr. Bouchett had started a competing business while still working for Reconciled and that he had been terminated.

Mr. Bouchett had a stock option agreement with Reconciled as of January 2022. Section 11 of the agreement states:

Notwithstanding any other provision of this Agreement, upon the Optionee's violation of any non-competition, non-solicitation, confidentiality, intellectual property, or non-disparagement provisions of any agreement between the Optionee and the Company or one of its Subsidiaries, the Optionee's outstanding Options (whether vested or unvested), will terminate and immediately cease to be exercisable.

On July 25, Mr. Bouchett negotiated an Option Repurchase Agreement, pursuant to which Reconciled paid Mr. Bouchett $60,000 for his stock options.

Disputed Facts

The parties dispute much more than they agree to. The main disagreement for purposes of Reconciled's and Mr. Ly's ability to recover against Mr. Bouchett and Ledgr is the date when Mr. Bouchett stopped being an employee of Reconciled. Mr. Bouchett asserts that he was no longer

employed by Reconciled after August 5 despite being on the payroll for PTO purposes until August 26. Mr. Bouchett supports this position by stating the following in his affidavit:

> I officially resigned in July 2022. Mr. Ly however asked me to stay through August 5, 2022, and I agreed. Mr. Ly asked me to put down August 26, 2022, in my resignation letter to allow another payroll cycle for my accrued PTO (paid time off). HR confirmed and everyone knew that my actual last day at Reconciled was August 5, 2022. As of August 5, 2022, I did not consider myself employed by Reconciled, did not perform any work for Reconciled, was not paid a salary, my access to Reconciled systems was blocked, and I did not go to the office. Everyone at Reconciled understood August 5, 2022, was my last day. As it turned out, Mr. Ly tried to cheat me out of my PTO and I had to resort to the Department of Labor to get paid.

Bouchett Affidavit, ¶ 10. Mr. Bouchett testified similarly during his deposition:

> Q: What was your final date that you put in . . . the separation letter?
>
> A: Well, I put two dates in the separation letter as Michael had requested. I had discussed with him that I wanted to be done by the end of July. He asked for me to stay on through August 5th. I agreed but told him I wanted to be paid my PTO because he had not historically paid out people's PTO unless he liked them, about 50/50 on whether or not, and I said, "I need to be paid out my PTO," and he said, "Well" -- we negotiated the stock option thing and then he said, "In your, in your resignation put your -- put the date of the 26th even though August is your -- August 5th is your last day."
>
> . . .
>
> Q: When did . . . Michael accuse you of creating Ledgr and going to work for a competing company?
>
> A: August 16th.
>
> Q: So were you actually already - - you had already stopped working for Reconciled before Michael made that accusation?
>
> A: For - - in my - - from my perspective, quite a while. Ten days seems like a long time when you're not employed, so, yes.

Bouchett Deposition at 167–68. Reconciled asserts that after August 5, but before August 26, Mr. Ly blocked Mr. Bouchett's access to Reconciled and terminated him after discovering that he had started a competing business while still employed by Reconciled. Mr. Bouchett disputes this, stating that Mr. Ly was unable to terminate him after August 5 because that was his last day of work.

The parties also dispute the significance of Mr. Bouchett's incorporation of Ledgr on June 30, his downloading and forwarding to his personal email 10,523 records from the Reconciled database, and the purpose and use of the Pitch Deck. Mr. Bouchett denies that he had secret plans to use Ledgr to

compete with Reconciled. During his deposition, Mr. Bouchett testified that he did not know in June what he was going to do with Ledgr and that Ledgr was not the first entity that he registered while working at Reconciled. Mr. Bouchett stated that he had not decided by August 15 what sort of business Ledgr would be. In his affidavit, he stated:

> By the end of June 2022, I registered Ledgr as a creative name to potentially start a consulting service for accounting firms or develop software after I left Reconciled. It was not my intention to use Ledgr to compete with Reconciled during my employment with Reconciled that ended on August 5, 2022. Mr. Ly supported the idea of my starting my own business, complimented me on my "entrepreneurial chops" as he put it, and even suggested he may become an investor in my business.

Bouchett Affidavit, ¶ 9. With regard to the downloading of Reconciled's records, Mr. Bouchett stated in his affidavit that "backup files from the CRM [Customer Relationship Management] were downloaded as part of the common practice of employees." *Id.* ¶ 11b. As to the Pitch Deck, Mr. Bouchett testified as follows:

> Q: What was this PowerPoint presentation, pitch deck, what was this put together to do?
>
> A: It's a summary of an idea, an idea that is -- certainly this one was an idea, just an idea, one of the many I had at the time of business that would be interesting.
>
> Q: Was Ledgr operational at the time you created this pitch deck?
>
> A: No.
>
> . . .
>
> Q: Did you create this for fundraising opportunity, investment opportunities?
>
> A: Not specifically. But it could easily be a tool in fundraising activities.

Bouchett Deposition at 142. Discussion of the Pitch Deck continued:

> Q: Okay. I'm thinking you use a pitch deck to show it to a new client and show your wares, like a prospectus?
>
> A: It was never used as a client facing document. This particular version of this document is a -- was a brainstorm document that I floated to friends and kept for myself just to visualize.
>
> Q: Did you -- do you have a pitch deck now at Ledgr?
>
> A: I have several, yeah. Yes.
>
> Q: Is it like that?

A. No, it does not look like that. It may -- follows a lot of the same formatting but it is not -- no, it looks nothing like this.

Bouchett Deposition at 206–07. The Pitch Deck included a "team" listing four individuals in addition to himself, some of whom may have been Reconciled employees. Mr. Bouchett testified, however, that these individuals were not on the Ledgr team when the Pitch Deck was created because the Pitch Deck "was a brainstorm . . . not a company that had materialized in any capacity . . . so, this was very much at an explorational phase." *Id*. at 151. Mr. Bouchett testified that he did not think he showed the Pitch Deck to the individuals listed as team members. *Id*.

Mr. Bouchett also testified that he had no intention of competing with Reconciled while he was employed there and denies that Ledgr's business directly competes with Reconciled. He agreed during his deposition that both Reconciled and Ledgr provide bookkeeping services but explained his view of why the two businesses are not competitors:

Q: Now, you tell me why you're not - why Ledgr isn't a competitor of Reconciled.

A: Sure. For the same reasons that my gas station sells soap and Amazon sells soap, but I wouldn't say that Amazon competes with the gas station. I think that you're – you've narrowed down a few of the products that we sell and a few of the products that they sell that overlap. Reconciled also has tax services, CPA services. That's not something Ledgr touches. Online bookkeeping is a pretty broad term. The way in which we provide those services is very different[.]

Bouchett Deposition at 126. Mr. Bouchett also stated that after his employment ended at Reconciled, he "made sure any new customer at Ledgr who may have had a past relationship with Reconciled, had ended that relationship before becoming a new Ledgr customer." Bouchett Affidavit ¶ 11d. Mr. Bouchett testified similarly at his deposition:

Q: Did you actually reach out to any Reconciled customers to see if they wanted to come work -- to come and have Ledgr do their work?

A: No, I didn't.

Q: Not even inadvertently?

A: Possibly inadvertently. There would be no real way for me to know. I don't have like a rolling customer list of Reconciled's, certainly none with any updates. So, it's possible I inadvertently did that but certainly not on purpose, and I would not have taken a client from Reconciled that was working directly with Reconciled at that time. I would have let them know, I can't work with you until you're not working with Reconciled and that relationship is over.

Bouchett Deposition at 127.

<u>Legal Analysis</u>

1. <u>Reconciled's Claims Against Mr. Bouchett</u>

The employment agreement and Proprietary Information and Inventions Agreement precluded Mr. Bouchett from engaging in certain activities while he was employed and other activities following his termination for a period of one year. Reconciled argues that it is entitled to summary judgment because, while he was still an employee, Mr. Bouchett violated the covenant not to compete by creating Ledgr, developing a Pitch Deck for investors, and seeking out investors. Memorandum at 6. The only conduct that Reconciled alleges Mr. Bouchett engaged in before August 5 that violated the employment agreement was (1) incorporating Ledgr and (2) emailing records from Reconciled's database to his personal email.

Mr. Bouchett does not dispute engaging in either of these acts, but he denies that they violated any obligation to Reconciled. As Mr. Bouchett testified in both his deposition and in a supporting affidavit, before August 5, Mr. Bouchett did not have firm plans about the business Ledgr would engage in. In addition, the parties dispute whether Ledgr competes with Reconciled. The fact that both companies perform bookkeeping services falls well short of establishing that they are competitors. As to the corporate records, Mr. Bouchett testified that it was a common practice for Reconciled employees to email themselves records from the database and that these records were not used for any improper purpose. Reconciled presents no evidence disputing Mr. Bouchett's testimony or showing that Mr. Bouchett used these records for an improper purpose. These, then, are genuine disputes that preclude summary judgment.

With regard to the Pitch Deck, Mr. Bouchett testified that it was created as a brainstorming exercise, and Reconciled presents no evidence that this document was used for any improper purpose. As for the charge of seeking out investors while Mr. Bouchett was still employed by Reconciled, the employment agreement does not specifically address investors or limit Mr. Bouchett's ability to seek out investors for an endeavor separate from Reconciled if the endeavor does not compete with Reconciled or involve some other violation of the employment agreement. Thus, there is at least a genuine dispute of material fact on these points.

Several of Reconciled's allegations are based on its assertion that Mr. Bouchett was a Reconciled employee until August 26. This finds some support in Mr. Bouchett's letter of resignation, which stated that his "last day of employment will be August 26th, 2022[.]" In response, Mr. Bouchett notes that the same letter stated: "my final day of work [will be] August 5th (prior to my scheduled PTO)." There is thus some internal tension in the letter itself.

The employment agreement and Proprietary Information and Inventions Agreement do not help resolve this tension. The agreement itself restricts activities "[w]hile you render services to the Company." While the Proprietary Information and Inventions Agreement imposes some restrictions on activities "[a]s an employee" and other restrictions "[a]fter termination," it does not specify when an individual's status as an employee terminates. The restrictions on "employees" leads with the phrase "During my employment with the Company, I will not . . . ." These documents thus create a tension similar to that inherent in Mr. Bouchett's letter of resignation: if as of August 5, he was no longer rendering services to the company, was he nevertheless then bound by restrictions applicable to him "as an employee?"

" '[T]he cardinal rule in construing contracts is the intent of the parties' " *Beldock v. VWSD, LLC*, 2023 VT 35, ¶ 27 (quoting *Sullivan v. Lochearn, Inc.*, 143 Vt. 150, 152 (1983)). The intent of the parties is determined by examining the language they used in the contract. *Sutton v. Purzycki*, 2022 VT 56, ¶ 37, 217 Vt. 326 (citing *Lussier v. Lussier*, 174 Vt. 454, 455 (2002) (mem.)). " 'To determine the meaning of a specific provision of a contract, we consider the whole instrument and construe it in harmony if possible.' " *Beldock*, 2023 VT 35, ¶ 27 (quoting *John A. Russell Corp. v. Bohlig*, 170 Vt. 12, 17 (1999). "If a contract 'fairly admits of but one interpretation,' then it is unambiguous." *Sutton*, 2022 VT 56, ¶ 37 (quoting *Isbrandtsen v. N. Branch Corp.*, 150 Vt. 575, 580–81 (1988)). When a contract is ambiguous, however, its interpretation " 'becomes a question of fact.' " that cannot be determined on summary judgment. *Sutton*, 2022 VT 56, ¶ 38 (quoting *Constr. Drilling, Inc. v. Eng'rs Constr., Inc.*, 2020 VT 38, ¶ 12, 212 Vt. 323)). In that case, the court may consider extrinsic evidence, including the parties' circumstances when the agreement was executed, to determine its meaning. *Beldock*, 2023 VT 35, ¶ 28.

Considering the employment agreement as a whole, it is not clear whether Mr. Bouchett's employment ended after he stopped rendering services to Reconciled, which the parties agree was August 5, or whether he was still "employed" until August 26, when he was supposed to receive the PTO that he had accrued. This ambiguity affects all of Reconciled's claims: each claim rests on the premise that Mr. Bouchett engaged in prohibited activities "as an employee." On the undisputed facts properly before the court, particularly giving Mr. Bouchett the benefit of all reasonable doubts and inferences, *see Carr v. Peerless Ins. Co.*, 168 Vt. 465, 476 (1998), the court cannot determine, as a matter of law, that Mr. Bouchett was still acting "as an employee" between August 5 and August 26. That issue remains a dispute of fact for the jury.

2. Mr. Bouchett's Counterclaims

Reconciled and Mr. Ly also move for summary judgment on Mr. Bouchett's counterclaims, which include defamation, promissory estoppel, unjust enrichment, and intentional misrepresentations.

A. Defamation

Mr. Bouchett's defamation claim is based on statements Mr. Ly allegedly made to third parties regarding Mr. Bouchett's improperly taking company records, diverting customers and investors to himself, engaging in betrayal and backstabbing, and violating his employment agreement. Amended Counterclaim, ¶¶ 3–4.

To prove defamation, Mr. Bouchett must establish the following:

(1) a false and defamatory statement concerning another; (2) some negligence, or greater fault, in publishing the statement; (3) publication to at least one third person; (4) lack of privilege in the publication; (5) special damages, unless actionable per se; and (6) some actual harm so as to warrant compensatory damages.

*Stone v. Town of Irasburg*, 2014 VT 43, ¶ 61, 196 Vt. 356 (quoting *Lent v. Huntoon*, 143 Vt. 539, 546–47 (1983)). Reconciled and Mr. Ly rest their defense here on truthfulness and privilege. *See Lent*, 143 Vt. at 548 (truth is complete defense to charge of defamation); *Crump v. P&C Food Markets, Inc.*, 154 Vt. 284, 293 (1990) (employers have conditional privilege to protect legitimate business interests that may be overcome by showing of malice). As discussed above, genuine issues of material fact exist with regard to whether Mr. Bouchett engaged in conduct that violated his employment agreement or that were otherwise wrongful. These disputes go to both the truthfulness of the allegedly defamatory statements and presence or absence of malice. Thus, this claim is not susceptible to summary judgment.

B. Promissory Estoppel

Mr. Bouchett's counterclaim asserting promissory estoppel is based on promises Reconciled and Mr. Ly allegedly made regarding Mr. Bouchett's compensation. Mr. Bouchett asserts that Reconciled and Mr. Ly "promised to pay [him] 2% of the sales of all direct reports (successful sales) and 4% equity in Reconciled" (Counterclaim ¶ 18); that they promised him a base salary of $85,000 per year plus "2% of all sales transactions for the company up to a certain point of monthly revenue (alleged to be $500,000), and 1% commission in excess of that point, in exchange for [his] taking on new responsibilities outside of his job description as 'Revenue Leader' " (*id*. ¶ 20); that they "planned to acquire 4 to 7 new accounting firms under Reconciled that would drive a minimum of $7,000,000 in additional revenue" (*id*. ¶ 21); and that they "informed [him] that Ly had financing and deals lined up

to support their promises to Bouchett" (*id*. ¶ 22). Mr. Bouchett alleges that he agreed to stay on with Reconciled if his compensation was increased to $240,000 per year plus commissions of 2% of total revenue and 1.5% equity in the company, to which Reconciled and Mr. Ly agreed. *Id*. ¶ 30. Ultimately, Mr. Bouchett asserts, he accepted the proposal set forth in the employment agreement based on Reconciled and Mr. Ly's "other promises" and the belief that they "would honor their commitments" to acquire other firms, which would result in an increase in his commissions. *Id*. ¶ 33. When Reconciled and Mr. Ly failed to acquire other companies as promised and his commissions were not increased, Mr. Bouchett asserts that the parties' agreement was "scuttled" and he decided to resign. *Id*. ¶¶ 34–36. Mr. Bouchett asserts that he would not have continued working for Reconciled if not for the promises made to him about acquisitions of other companies and increased commissions that he would earn as a result. He asks the court to award him damages for breach of these promises, to include lost compensation and career damages, among other damages. *Id*. ¶¶ 46–48.

To prove promissory estoppel, Mr. Bouchett must prove that (1) Reconciled and Mr. Ly made him a promise they should have reasonably expected to induce action or forbearance, (2) he relied on the promise to his detriment; and (3) injustice can only be avoided by enforcing the promise. *Pettersen v. Monaghan Safar Ducham PLLC*, 2021 VT 16, ¶ 11, 214 Vt. 269 (citing *Foote v. Simmonds Precision Prods. Co.*, 158 Vt. 566, 573 (1992) (adopting elements set out in Restatement (Second) of Contracts)). Reconciled and Mr. Ly argue that the employment agreement "contains all of the terms of Mr. Bouchett's employment with the company, including his compensation," and that the terms of his employment could not be changed except by a written amendment signed by both parties.

Mr. Bouchett's employment agreement includes the following provision:

> 7. **Interpretation, Amendment and Enforcement**. This letter agreement, Exhibit A and Commission Agreement constitute the complete agreement between you and the Company, contain all of the terms of your employment with the Company and supersede any prior agreements, representations or understandings (whether written, oral or implied) between you and the Company. This letter agreement may not be amended or modified, except by an express written agreement signed by both you and a duly authorized officer of the Company. . . .

Then, on the agreement's signature page, the following language appears above Mr. Bouchett's signature:

> This letter, along with any agreements relating to proprietary rights between you and the Company, set forth the terms of your employment with the Company and supersede any prior representations or agreements including, but not limited to, any representations made during your recruitment, interviews or pre-employment negotiations, whether written or oral. This letter, including, but not limited to, its at will employment

provision, may not be modified or amended except by a written agreement signed by the Chief Executive Officer of the Company and you.

These are prototypical merger clauses. *See Kneebinding, Inc. v. Howell*, 2018 VT 101, ¶ 114, 205 Vt. 78. (A merger clause " 'negates the impact of earlier negotiations and contract drafts, and states that the written contract is the complete extension of the parties' agreement.' ") (quoting *Fit Tech, Inc. v. Bally Total Fitness Holding Corp.*, 374 F.3d 1, 10 (1st Cir. 2004)). Merger clauses are "designed to avoid the confusion created when parties may have several agreements or contracts between them prior to completing a written agreement." *Hoeker v. Department of Social and Rehabilitation Services*, 171 Vt. 620, 621 (2000) (mem.). They verify that the parties have adopted the contract "'as a complete and exclusive statement of the terms of the agreement.'" *Id*. (quoting Restatement (Second) of Contracts § 210 (1981)) (emphasis omitted). The written agreement "becomes the exclusive medium for determining the understanding of the parties, and prior agreements covering the same subject matter are unenforceable." *Id*. at 621–22 (citing *Dartmouth Sav. Bank v. F.O.S. Assocs.*, 145 Vt. 62, 69 (1984)); *accord Kneebinding,* 2018 VT 101, ¶ 113.

The promises Mr. Bouchett alleges Reconciled and Mr. Ly made concern his compensation, which is squarely addressed in his employment agreement. Any prior or inconsistent representations they may have made regarding his compensation are unenforceable to the extent they are not reflected in the agreement. *See Hoeker*, 171 Vt. at 622. "Even without the merger clause, the parol evidence rule would bar enforcement of a prior or contemporaneous oral agreement that varies or contradicts the terms of the written agreement." *Id*. (citing *Housing Vt. v. Goldsmith & Morris,* 165 Vt. 428, 431 (1996)). In short, Reconciled and Mr. Ly are entitled to summary judgment on the promissory estoppel claim.

C. Unjust Enrichment

Mr. Bouchett's counterclaim for unjust enrichment is based on contributions he allegedly made to Reconciled but for which he was not compensated. This claim seems to be based on the same promises as those described in Mr. Bouchett's claim for promissory estoppel.

" 'Under the doctrine of unjust enrichment, a party who receives a benefit must return the benefit if retention would be inequitable.' " *Beldock*, 2023 VT 35, ¶ 68 (quoting *Kellogg v. Shushereba*, 2013 VT 76, ¶ 22, 194 Vt. 446 (quotation and alteration omitted)). To prevail, "a 'plaintiff must prove that (1) a benefit was conferred on defendant; (2) defendant accepted the benefit; and (3) defendant retained the benefit under such circumstances that it would be inequitable for defendant not

to compensate plaintiff for its value.' " *Id.* (quoting *Center v. Mad River Corp.*, 151 Vt. 408, 412 (1989)).

Unjust enrichment is not available to a plaintiff when the parties have a valid contract that addresses the subject matter of the unjust enrichment claim. *Id.* ¶ 77 (citing Restatement (Third) of Restitution and Unjust Enrichment § 2(2)). Indeed, " '[t]he doctrine does not operate to rescue a party from the consequences of a bad bargain.' " *Id.* ¶ 78 (quoting *Washa v. Miller*, 546 N.W.2d 813, 819 (Neb. 1996)). Because the employment agreement addressed Mr. Bouchett's compensation, Mr. Bouchett may not rely on the theory of unjust enrichment to recover more compensation than he was entitled to receive under the agreement. Thus, Reconciled and My Ly are entitled to summary judgment on this claim as well.

D. Intentional Misrepresentation

Mr. Bouchett's final counterclaim is for intentional misrepresentation. This claim rests on two allegations: first, that Reconciled and Mr. Ly "intentionally misrepresented existing facts concerning their business practices and operations as well as their earnings and other key facts that affected the essence of the employment transactions and relationship between Reconciled and Bouchett" and second, that they "deliberately failed to provide Bouchett with key financial and strategic information." Counterclaim ¶¶ 56, 58. To prevail on this claim, Mr. Bouchett would have to prove by clear and convincing evidence that Reconciled and Mr. Ly made an "intentional misrepresentation of existing fact, affecting the essence of the transaction when the misrepresentation was false when made and known to be false to [Reconciled and Mr. Ly], [that] was not open to [Mr. Bouchett's] knowledge, and was relied on by [Mr. Bouchett] to [his] damage." *Kneebinding*, 2018 VT 101, ¶ 141.

Decision on this issue is driven by the standards applicable to a motion for summary judgment. Ordinarily, these standards are so familiar as not to bear repeating. Here, however, Mr. Bouchett's complete failure to attend to his obligations suggests the wisdom of restating the obvious.

Under Rule 56, the initial burden falls on the moving party to show an absence of dispute of material fact. *E.g.*, *Couture v. Trainer*, 2017 VT 73, ¶ 9, 205 Vt. 319 (citing V.R.C.P. 56(a)). "Where the moving party does not bear the burden of persuasion at trial, it may satisfy its burden of production by showing the court that there is an absence of evidence in the record to support the nonmoving party's case." *Ross v. Times Mirror, Inc.*, 164 Vt. 13, 18 (1995). When the moving party has met its initial burden, the burden shifts to the non-moving party; that party may not rest on mere allegations, but must come forward with evidence that raises a dispute as to the facts in issue. *E.g.*, *Clayton v. Unsworth*, 2010 VT 84, ¶ 16, 188 Vt. 432 (citing *Gore v. Green Mountain Lakes, Inc.*, 140 Vt. 262,

266 (1981) and *Alpstetten Ass'n, Inc. v. Kelly*, 137 Vt. 508, 514 (1979)). Where the non-moving party bears the burden of proof on an issue, if fairly challenged by the motion papers, it must come forward with evidence sufficient to meet its burden of proof on that issue. *E.g.*, *Burgess v. Lamoille Housing P'Ship*, 2016 VT 31, ¶ 17, 201 Vt. 450 (citing *Poplaski v. Lamphere*, 152 Vt. 251, 254–55 (1989)).

Here, Reconciled and Mr. Ly amply met their initial burden. They not only asserted that "Mr. Bouchett has no facts supporting any intentional misrepresentations"; they followed up with references to the record that at the very least called into question Mr. Bouchett's ability to meet his burden of proof. Mem. in Support of Mot. for Summ. J., 16–17. In response, the closest Mr. Bouchett comes to producing evidence sufficient to meet his burden of proof is a blanket reference to an interrogatory answer, which, he states, "sets forth the representations made by Mr. Ly." *See* Opp. to Mot. for Summ. J., 25. He fails even to attempt to show how any of those alleged representations meet any of the essential elements of an intentional misrepresentation claim. If there is evidence disclosed in the discovery response sufficient to meet Mr. Bouchett's burden at trial, his response leaves the court completely in the dark as to what that evidence might be.

"Judges are not like pigs, hunting for truffles buried in briefs." *U.S. v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). The court declines to do Mr. Bouchett's homework for him. Mr. Bouchett's failure to respond to the challenge fairly posed by Reconciled and Mr. Ly with more than bald assertions thus dooms his intentional misrepresentation claims.

Conclusion

The court denies Reconciled's motion for summary judgment on the claims asserted in its complaint and on Mr. Bouchett's counterclaims against Reconciled and Mr. Ly asserting defamation. The court grants Reconciled's and Mr. Ly's motion for summary judgment on Mr. Bouchett's counterclaims asserting promissory estoppel, unjust enrichment, and misrepresentation. Per the operative Scheduling Order, this matter should now be ready for trial. The clerk will schedule a pretrial conference and jury drawing.

Electronically signed pursuant to V.R.E.F. 9(d): 12/10/2024 2:16 PM

_____
Samuel Hoar, Jr.
Superior Court Judge